2003-NMCA-074

70 P.3d 772

**STATE of New Mexico, Plaintiff– Appellant,**

**v.**

**Richard Grey KIRBY, Defendant– Appellee.**

**State of New Mexico, Plaintiff–Appellant,**

**v.**

**Joseph Clyde Collins and Joy E. Collins, Defendants–Appellees.**

**Nos. 22,967, 23,020.**

Court of Appeals of New Mexico.

March 21, 2003.

Certiorari Denied, No. 28,020, May 20, 2003.

Certiorari Quashed, No. 28,021, May 28, 2003.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellant.

John D. Cline, Freedman Boyd Daniels Hollander, Goldberg & Cline P.A., Albuquerque, NM, for Appellee Richard Grey Kirby.

John B. Bigelow, Chief Public Defender, Susan Roth, Santa Fe, NM, for Appellee Joseph Clyde Collins.

Mathew Connelly, Albuquerque, NM, for Appellee Joy E. Collins.

## OPINION

SUTIN, Judge.

{1} Two cases on appeal present for us the issue whether administrative imposition of the civil penalty contained in the New Mexico Securities Act bars, under New Mexico Double Jeopardy jurisprudence, a criminal prosecution under that Act for the same conduct on which the civil penalty was imposed. We have consolidated *State v. Kirby*, Docket No. 22,967, and *State v. Collins*, Docket No. 23,020, for purposes of disposition of these cases on appeal.

{2} Each Defendant was indicted on criminal securities violations based on the same conduct for which administrative penalties were imposed. In each case, the district court dismissed criminal charges for securities violations on the ground that each Defendant had been unconstitutionally put in jeopardy by an order issued by the Securities Division of the New Mexico Regulation and Licensing Department (the Division). Based on a Securities Division hearing officer's findings and conclusions, the acting director of the Division entered administrative orders that, among other things, imposed a monetary penalty on each Defendant. The State appeals in both cases.

{3} The appeals require this Court to analyze the extent, if any, to which the double jeopardy analysis and holding in *State v. Nunez*, 2000–NMSC–013, 129 N.M. 63, 2 P.3d 264, should be applied to preclude imposition of both civil and criminal penalties under the New Mexico Securities Act of 1986, NMSA 1978, §§ 58–13B–1 to –57 (1986, as amended through 1999) [hereinafter Securities Act or the Act], for the same conduct. We analyze *Nunez* together with two other New Mexico Supreme Court cases bearing on the issue before us: *State ex rel. Schwartz v. Kennedy*, 120 N.M. 619, 904 P.2d 1044 (1995), decided before *Nunez*; and *City of Albuquerque v. One (1) 1984 White Chevy*, 2002–NMSC–014, 132 N.M. 187, 46 P.3d 94 [hereinafter *White Chevy*], decided after *Nunez*. We decline to extend *Nunez* to the circumstances in these cases, and therefore reverse the dismissals in both *Kirby* and *Collins*.

## *KIRBY* BACKGROUND AND DISPOSITION

{4} Some of the facts underlying the administrative order are virtually the same as those underlying the counts of the *Kirby* indictment. No issue exists on that point. In New Mexico, in 1998 Defendant engaged in transactions that became the subject matter of a Securities Division investigation and administrative proceeding. The administrative proceeding involved several transactions in which Defendant attempted, through misrepresentations, to sell securities without being a registered broker and without registering the securities, and supplied placement materials and disclosure statements to potential buyers that contained misrepresentations.

{5} The administrative order imposed a civil penalty of $75,000. How the hearing officer and acting director arrived at this amount is unclear. It may, but does not necessarily, reflect a finding that Defendant

engaged in fifteen separate violations of the Securities Act, in that the maximum civil penalty allowed under the Act is $5,000 for each violation. *See* § 58–13B–37(B)(4) (authorizing an order "imposing a civil penalty up to a maximum of five thousand dollars ($5,000) for each violation"). The administrative order also required Defendant to pay $1,000 "for costs of investigation." *See* § 58–13B–44(B).

{6} In addition to the penalty imposed, the administrative order, dated July 25, 2000, required Defendant to "cease and desist from offering to sell or selling securities of any kind in New Mexico without first complying with all provisions of the [Securities Act]," and "permanently barred [Defendant] from associat[ing] with any licensed broker-dealer or investment advisor in this State." *See* § 58–13B–37(B)(1), (3) (authorizing various administrative sanctions for violation of the Securities Act). The order further required Defendant to offer all purchasers of securities the opportunity to rescind their purchases and receive their money back. The Division never sought relief in the district court based on its administrative order. *See* §§ 58–13B–37(B)(5); –38 (authorizing court enforcement of administrative orders).

{7} Defendant filed a notice of appeal from the administrative order in August 2000 to the district court. In October 2000, a grand jury indicted Defendant for various violations under the Securities Act.

{8} In his statement of appellate issues, served in April 2001 in the district court appeal, Defendant asserted, among other things, that the administrative order should be vacated because Defendant did not knowingly and intelligently waive his right to counsel in the administrative proceeding. Also in April 2001, Defendant filed a "Notice of Dismissal in Part" of his appeal from the administrative order. In this notice of dismissal, Defendant stated that he "dismisses his appeal from the portion of the final order of the New Mexico Securities Division imposing on him a penalty of $75,000.... By dismissing this portion of his appeal, [Defendant] does not concede that the penalty is appropriate or lawful."

{9} In May 2001, the Division moved, with Defendant's consent, to vacate the findings of fact, conclusions of law, and the administrative order because the record did not indicate that the hearing officer informed Defendant of his right to counsel or of potential adverse risks and consequences of proceeding without counsel. The district court vacated the administrative order, stating:

It is hereby ORDERED that the Findings of Fact, Conclusions of Law and Final Order entered by the Acting Director of the Securities Division on July 25, 2000 in the administrative proceeding captioned *In the Matter of: Continental Exchange Trust, Richard G. Kirby and Julie Kirby,* Order No.2000–99–001–059(FO), be and hereby is vacated and set aside without prejudice. Appellant Richard G. Kirby had dismissed his appeal as to the portion of such administrative order providing for imposition of a civil penalty on him, and therefore the issue of such civil penalty is no longer before the Court in the current proceeding and the portion of the administrative order imposing a civil penalty on Appellant Richard G. Kirby is not affected by this order.

The court remanded the case to the Division for a new hearing.

{10} Shortly after the administrative order was vacated, Defendant filed a motion in his pending criminal case to bar further prosecution on the grounds that further prosecution would violate the double jeopardy clause of Article II, Section 15 of the New Mexico Constitution and the double jeopardy statute, NMSA 1978, § 30–1–10 (1963). In January 2002, the district court granted the motion and dismissed the criminal charges against Defendant with prejudice. The State appeals to this Court.

{11} The State asserts that the district court erroneously determined that the administrative proceeding was a criminal prosecution barring subsequent enforcement of criminal violations; that, even assuming the administrative proceeding resulted in punishment, the count of the criminal complaint charging ordinary fraud should be permitted because it does not involve a Securities Act offense; that Defendant was not placed in

"jeopardy" by the administrative proceeding; and that use of the double jeopardy clause to bar Defendant's prosecution constitutes an improper manipulation of the courts. We reach only the first issue: whether the district court erred in determining that imposition of the administrative civil penalty was sufficient to bar Defendant's subsequent criminal prosecution.

## Standard of Review and Defendant's Burden

{12} We interpret Defendant's having ignored Rule 12–213(A)(4), (B) NMRA 2003, requiring the parties to state the standard of review, to mean either that Defendant does not care what standard of review we employ or agrees with the State's recitation of the standard of review. Our review is de novo, in that the facts material to the issues are not disputed and we are met with issues of law. *White Chevy*, 2002–NMSC–014, ¶ 5, 132 N.M. 187, 46 P.3d 94; *State v. Attaway*, 117 N.M. 141, 144–46, 870 P.2d 103, 106–08 (1994).

{13} We must examine the legislative intent behind the Securities Act and its provisions. "In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background." *Key v. Chrysler Motors Corp.*, 1996–NMSC–038, 121 N.M. 764, 768–69, 918 P.2d 350, 354–55. "[A]ll parts of a statute must be read together to ascertain legislative intent." *Id.* at 769, 918 P.2d at 355. In doing so, we seek to produce "a harmonious whole" by construing each part of the statute in connection with every other part to achieve the goals of the Legislature. *Id.*

{14} The issue in *White Chevy* was whether a city ordinance requiring civil forfeiture of vehicles violated the United States or New Mexico double jeopardy clauses or a statutory double jeopardy provision. 2002–NMSC–014, ¶¶ 2, 19, 132 N.M. 187, 46 P.3d 94. The Supreme Court set out the following under its recitation of the standard of review:

A strong presumption of constitutionality surrounds a statute. A party challenging the constitutionality of a statute has the burden of proving it is unconstitutional beyond a reasonable doubt. In construing a particular statute, a reviewing court's central concern is to determine and give effect to the intent of the [L]egislature.

*Id.* ¶ 5 (internal quotation marks and citations omitted) (alteration in original).

### The Double Jeopardy Clause and Statute

{15} Defendant does not assert a violation of the federal double jeopardy clause. *See* U.S. Const. amend. V. Instead, Defendant asserts violations of both our double jeopardy clause in Article II, Section 15 of the New Mexico Constitution and our double jeopardy statute, Section 30–1–10. Defendant urges us to afford him the same protection as that afforded the defendants in *Nunez* under our double jeopardy jurisprudence.

{16} In *Nunez*, our Supreme Court departed "from federal constitutional doctrine because of the distinctive characteristics of New Mexico's double-jeopardy and forfeiture jurisprudence." 2000–NMSC–013, ¶¶ 17, 18, 24–27, 54, 129 N.M. 63, 2 P.3d 264; *see State v. Gomez*, 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1; *State v. Breit*, 1996–NMSC–067, ¶¶ 19–24, 32, 122 N.M. 655, 930 P.2d 792. The Court in *Nunez* labeled its own double jeopardy test as being "[a]mong the distinctive state characteristics in New Mexico's double-jeopardy jurisprudence." 2000–NMSC–013, ¶ 36, 129 N.M. 63, 2 P.3d 264. The Court rejected the more limited test set forth in the United States Supreme Court case of *United States v. Ursery*, 518 U.S. 267, 277–78, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), as well as *Ursery*'s forfeiture double jeopardy analysis. *Nunez*, 2000–NMSC–013, ¶¶ 37–47, 129 N.M. 63, 2 P.3d 264. The Court in *Nunez* determined that the New Mexico Constitution afforded New Mexico defendants greater rights than the federal Constitution. 2000–NMSC–013, ¶¶ 16, 54–94, 117, 129 N.M. 63, 2 P.3d 264.

{17} The New Mexico Constitution's double jeopardy clause reads:

No person shall be compelled to testify against himself in a criminal proceeding, nor shall any person be twice put in jeopardy for the same offense; and when the indictment, information or affidavit upon

which any person is convicted charges different offenses or different degrees of the same offense and a new trial is granted the accused, he may not again be tried for an offense or degree of the offense greater than the one of which he was convicted. N.M. Const. art. II, § 15. Our double jeopardy statute reads:

No person shall be twice put in jeopardy for the same crime. The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment. When the indictment, information or complaint charges different crimes or different degrees of the same crime and a new trial is granted the accused, he may not again be tried for a crime or degree of the crime greater than the one of which he was originally convicted.

§ 30–1–10.

### The Test for Double Jeopardy

{18} Our discussion centers on *Schwartz*, *Nunez*, and *White Chevy*. *Schwartz* involved an administrative revocation of a driver's license and the subsequent prosecution for driving while intoxicated. *Schwartz*, 120 N.M. at 622, 904 P.2d at 1047. The Supreme Court determined there was no double jeopardy violation. *Id.* at 635, 904 P.2d at 1060. *Nunez* involved vehicle forfeiture proceedings under the Controlled Substances Act, NMSA 1978, §§ 30–31–1 to –41 (1972, as amended through 2002), followed by a criminal prosecution under that same act. *Nunez*, 2000–NMSC–013, ¶¶ 1, 16, 129 N.M. 63, 2 P.3d 264. The Court determined there was a double jeopardy violation. *Id.* ¶ 17. *White Chevy* involved vehicle forfeiture under a city ordinance followed by a criminal prosecution for driving while intoxicated. *White Chevy*, 2002–NMSC–014, ¶ 1, 132 N.M. 187, 46 P.3d 94. The Court determined there was no double jeopardy violation. *Id.* ¶ 2.

■ {19} *Schwartz* provided a basic framework for a civil/criminal double jeopardy analysis:

(1) whether the State subjected the defendant to separate proceedings; (2) whether the conduct precipitating the separate proceedings consisted of one offense or two offenses; and (3) whether the penalties in each of the proceedings may be considered "punishment" for the purposes of the Double Jeopardy Clause.

120 N.M. at 626, 904 P.2d at 1051. *Nunez* employed these *Schwartz* factors. *See Nunez*, 2000–NMSC–013, ¶ 54, 129 N.M. 63, 2 P.3d 264. So did *White Chevy*. *See* 2002–NMSC–014, ¶¶ 2, 8, 132 N.M. 187, 46 P.3d 94.

{20} In its letter decision, the district court in the present case looked to the *Schwartz* factors. The court determined "[t]here is no issue that this matter involves two separate proceedings." The court also determined that the conduct alleged in the administrative proceeding was the same as that alleged in the indictment and required the same evidence for proof. In regard to the civil penalty, the court determined that "[t]here is no question the $75,000.00 penalty constitutes punishment." The court did not state how it reached this conclusion.

{21} In regard to the first *Schwartz* factor, it is clear that the administrative proceeding resulting in the $75,000 civil penalty and the criminal prosecution in district court were two separate proceedings. As for the second *Schwartz* factor, it is equally clear that the same conduct precipitated the separate proceedings and forms the basis for both the administrative violations and the criminal charges against Defendant. The conduct consisted of one offense. *See Nunez*, 2000–NMSC–013, ¶ 59, 129 N.M. 63, 2 P.3d 264 ("[I]n the case of forfeitures under the Controlled Substances Act, we hereby establish a presumption that when a forfeiture action and a criminal action are directed at the same defendant and rely on the same general evidence, then both proceedings concern the same offense.").

■ {22} Thus, the critical issue involves the third *Schwartz* factor. That issue is whether the $75,000 civil penalty is remedial or punitive. *See White Chevy*, 2002–NMSC–014, ¶ 9, 132 N.M. 187, 46 P.3d 94 (using the same *Schwartz*-factor approach). *White Chevy* sets forth the following test:

To determine whether a sanction is remedial or punitive, a reviewing court begins by evaluating the government's pur-

pose in enacting the legislation, rather than evaluating the effect of the sanction on the defendant. Then the court must determine whether the sanction established by the legislation was sufficiently punitive in its effect that, on balance, the punitive effects outweigh the remedial effect. Although a civil penalty may cause a degree of punishment for the defendant, such a subjective effect cannot override the legislation's primarily remedial purpose. *Id.* ¶ 11 (internal quotation marks and citations omitted). We employ this test.

### Purpose and Effect of the Civil Penalty

{23} The Securities Act, as a whole, has remedial purpose. It is comprehensive. Its extensive regulatory and administrative provisions are aimed at protecting investors against unfair, deceptive, and fraudulent practices in the sale of securities. Lengthy regulations have been adopted to implement the Act. *See* 12.11.1 to 12.11.16 NMAC 2003.

■ {24} The Act was written "with all encompassing strokes to protect the public," and to further "the legitimate governmental purpose of protecting the public from the many means promoters may use to separate the unwary from their money." *State v. Ramos,* 116 N.M. 123, 126, 860 P.2d 765, 768 (Ct.App.1993) (internal quotation marks and citations omitted). In enacting the Act, our Legislature undoubtedly shared the legislative intent behind the Securities Exchange Act of 1934, which was "to insure honest securities markets and thereby promote investor confidence ... [and] to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Sec. & Exch. Comm'n v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (internal quotation marks and citation omitted).

{25} Of the fifty-seven sections in the Act, only one section specifies criminal conduct. That one section, Section 58–13B–39, which is the section under which Defendant was indicted, states:

A. A person who willfully violates a provision of the [Securities Act] or a rule or order under that act is guilty of a third degree felony and may, upon conviction, be fined not more than five thousand dollars ($5,000) or imprisoned not more than three years or both for each violation.

B. The director may refer such evidence as is available concerning violations of the [Securities Act] or any rule or order under that act to the attorney general or the proper district attorney, who may, with or without such a reference from the director, institute the appropriate criminal proceedings.

C. The attorney general or district attorney may request assistance from the director or employees of the division.

D. No indictment or information may be brought under this section more than five years after the alleged violation.

E. Nothing in the [Securities Act] limits the power of the state to punish a person for conduct which constitutes a crime under other law.

{26} Under the Act's administrative provisions, the director has authority to issue cease and desist orders, without a prior hearing, against persons engaged in prohibited activities. § 58–13B–37(A). After a violation has occurred, the director has authority to conduct an administrative proceeding and to impose sanctions, including a cease and desist order, a censure, suspension or bar from practice, and a civil penalty. § 58–13B–37(B). Further, the director can proceed in court to obtain civil legal and equitable remedies, such as, temporary restraining orders, injunctions, writs, declaratory judgments, restitution orders, and receivers or conservators. § 58–13B–38(A). The civil penalty is one of several tools of regulatory and administrative enforcement. We determine that, as opposed to Section 58–13B–39 that provides for criminal penalties, the legislative purpose in enacting the civil penalty was that the penalty constitute an integral part of an overall remedial regulatory and administrative scheme to protect the public.

{27} We must, however, still address "whether the sanction established by the legislation was sufficiently punitive in its effect that, on balance, the punitive effects outweigh the remedial effect." *White Chevy,*

2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94. We turn primarily to *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), for our analysis of the "effect" aspect of the *White Chevy* test. *See White Chevy*, 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94 (noting, significantly, that *Hudson*, 522 U.S. at 99–100, 118 S.Ct. 488, "describ[es] the test for determining whether a statutory scheme created a civil remedy or criminal penalty").

▉ {28} In *Hudson*, the bank officers were indicted for misapplication of bank funds, for which the Office of the Comptroller of the Currency had previously assessed a civil penalty and had also issued an occupational debarment order under federal banking provisions. *Id.* at 95–96, 118 S.Ct. 488. The Court stated the inquiry to be "whether the statutory scheme was so punitive either in purpose or effect . . . as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id.* at 99, 118 S.Ct. 488 (internal quotation marks and citations omitted) (alteration in original). As a part of its reasoning with respect to the "effect" inquiry, the Court looked to aspects of the seven factor "non-exhaustive" analytical framework articulated in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *See Hudson*, 522 U.S. at 99–100, 103–04, 118 S.Ct. 488. Under the *Mendoza–Martinez* framework, courts are to examine:

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter* "; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Hudson*, 522 U.S. at 99–100, 118 S.Ct. 488 (quoting *Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. 554) (alteration in original). The Court determined that the statutes ex-

pressly stated the penalties were "civil," *id.* at 103, 118 S.Ct. 488, that "neither money penalties nor debarment has historically been viewed as punishment," *id.* at 104, 118 S.Ct. 488, that the sanctions imposed no " 'affirmative disability or restraint' as that term is normally understood," *id.*, that the sanctions did not come into play " 'only' on a finding of scienter," *id.*, and that simply because the conduct may also be criminal "is insufficient to render the money penalties . . . criminally punitive." *Id.* at 105, 118 S.Ct. 488.

▉ {29} We find the framework applied in *Hudson*, 522 U.S. at 99–100, 118 S.Ct. 488, and referred to as "the test" in *White Chevy*, 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94, helpful in conducting our analysis in this case. In using this framework, we expressly disavow any reliance on those portions of the *Hudson* opinion that place heavy emphasis on the label attached by the legislative body enacting the penalty or that indicate that a proponent of a double jeopardy claim must present the "clearest proof" of the punitive purpose or effect of the sanction. *Nunez* squarely rejects both propositions. *Nunez*, 2000–NMSC–013, ¶¶ 39–48, 129 N.M. 63, 2 P.3d 264.

▉ {30} Application of the seven *Mendoza–Martinez* factors leads us to conclude that the civil penalty in the Securities Act is more remedial than punitive in its effect. First, the civil penalty does not impose an "affirmative disability or restraint." *See Hudson*, 522 U.S. at 104, 118 S.Ct. 488 (providing that a monetary fine, coupled with an indefinite ban on working in the banking industry, did not constitute an "affirmative disability or restraint" because the sanctions did not "approach[ ] the infamous punishment of imprisonment" (internal quotation marks and citation omitted)). Furthermore, the civil penalty, while it may be harsh, does not carry the stigma of a criminal conviction. *See* NMSA 1978, § 31–13–1(A), (C) (2001) (stating that, unless certain conditions are met, a person convicted of a felony cannot vote or hold an office of public trust).

▉ {31} Second, "monetary assessments are traditionally a form of civil remedy." *United States v. Ward*, 448 U.S. 242, 256, 100

S.Ct. 2636, 65 L.Ed.2d 742 (1980) (Blackmun, J., concurring); *see Hudson,* 522 U.S. at 104, 118 S.Ct. 488 ("[N]either money penalties nor debarment has historically been viewed as punishment."); *Kimmelman v. Henkels & McCoy, Inc.,* 108 N.J. 123, 527 A.2d 1368, 1373 (1987) ("[M]onetary penalties have historically been regarded as civil, not criminal, penalties.").

{32} Third, the civil penalty does not come into play "only on a finding of scienter." *Mendoza–Martinez,* 372 U.S. at 168, 83 S.Ct. 554. The Securities Act provides for criminal penalties where an individual "willfully violates" a provision of the Securities Act. § 58–13B–39(A). Willfulness, however, is not a prerequisite to the imposition of a civil penalty under the Act. *See* § 58–13B–37(B); *Hudson,* 522 U.S. at 104, 118 S.Ct. 488 (concluding that scienter aspect of the *Mendoza–Martinez* framework is satisfied where the imposition of sanctions is contingent upon a finding of willfulness).

{33} Fourth, we evaluate the extent to which the civil penalty "will promote the traditional aims of punishment—retribution and deterrence." *Mendoza–Martinez,* 372 U.S. at 168, 83 S.Ct. 554. It would require us to ignore common sense to say that the civil penalty does not have some punitive and deterrent aspects in its nature. Indeed, in *Schwartz,* although a civil monetary penalty was not at issue, our Supreme Court distinguished a civil monetary sanction from an administrative license revocation. *Schwartz,* 120 N.M. at 634, 904 P.2d at 1059. The distinctions that *Schwartz* endeavored to make, however, have not left an indelible mark that requires a conclusion that the aim or effect of the civil penalty in the Securities Act is to invoke traditional criminal punishment, retribution and deterrence. In separating a driver's license revocation from criminal punishment, and in drawing a distinction between the revocation and a civil penalty, *Schwartz* looked to cases that have lost their vitality on this issue, namely, *Dep't of Revenue v. Kurth Ranch,* 511 U.S. 767, 769–70, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) (involving an assessment under Montana's Dangerous Drug Tax Act), and *United States v. Halper,* 490 U.S. 435, 438, 109 S.Ct.

1892, 104 L.Ed.2d 487 (1989) (involving a civil sanction under the civil False Claims Act for inflated Medicare claims). *Schwartz,* 120 N.M. at 634, 904 P.2d at 1059. *Halper's* double jeopardy analysis was largely disavowed in *Hudson. See Hudson,* 522 U.S. at 94, 101–02, 118 S.Ct. 488. *Hudson,* which specifically addressed a monetary civil penalty, reaffirmed the rule in *Ward,* 448 U.S. at 248–49, 100 S.Ct. 2636, as follows:

> A court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." Even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect, as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty."

*Hudson,* 522 U.S. at 99, 118 S.Ct. 488 (citations omitted) (alteration in original). Also, *Hudson* cites *Kurth Ranch* only to support the conclusion that *Halper's* "deviation from longstanding double jeopardy principles was ill considered." *Hudson,* 522 U.S. at 101–02 n. 6, 118 S.Ct. 488 (also stating that "[i]n *Kurth Ranch,* we held that the presence of a deterrent purpose or effect is not dispositive of the double jeopardy question"). Significantly, also since *Schwartz,* in its latest pronouncement of the test for determining whether a "sanction ... was sufficiently punitive in its effect that, on balance, the punitive effects outweigh the remedial effect," our Supreme Court looked to *Hudson,* and, through *Hudson,* to the *Mendoza–Martinez* guidelines. *White Chevy,* 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94. In that regard, our Supreme Court, citing *Schwartz,* states "[a]lthough a civil penalty may cause a degree of punishment for the defendant, such a subjective effect cannot override the legislation's primarily remedial purpose." *White Chevy,* 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94.

{34} While the civil penalty in the Securities Act may deter others from engaging in similar securities violations in the future, "the mere presence of this purpose is insufficient to render a sanction criminal, as

deterrence 'may serve civil as well as criminal goals.' " *Hudson,* 522 U.S. at 105, 118 S.Ct. 488 (quoting *Ursery,* 518 U.S. at 292, 116 S.Ct. 2135); *Schwartz,* 120 N.M. at 633, 904 P.2d at 1058 ("[T]he fact that the regulatory scheme has some incidental deterrent effect does not render the [administrative revocation of licenses] punishment for the purposes of double jeopardy analysis."). This sanction is plainly part of the director's arsenal for regulation of persons dealing in the sale of securities to the public, and speaks as much, if not more, to that regulatory challenge than to a sole need to punish. *See State v. Astorga,* 2000–NMCA–098, ¶ 6, 129 N.M. 736, 13 P.3d 468 (stating that revocation of good time credits for violation of prison rules has remedial purposes that "speak more to the administrative challenge of effective prison management and less to the goal of individual punishment"); *see also Sec. & Exch. Comm'n v. Palmisano,* 135 F.3d 860, 866 (2d Cir.1998) ("[T]he deterrence of securities fraud serves other important nonpunitive goals, such as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry."). We determine that, while the civil penalty may by its nature have effects of deterrence and punishment, those effects are incidental to and do not override the Act's and the civil penalty's primarily remedial purpose.

{35} Fifth, it is clear that the conduct upon which the civil penalty was based also formed the basis of Defendant's indictment. However, although we answer this *Mendoza–Martinez* issue affirmatively, "[t]his fact is insufficient to render the money penalties … criminally punitive … particularly in the double jeopardy context." *Hudson,* 522 U.S. at 105, 118 S.Ct. 488 (citation omitted).

{36} Sixth, there exists an alternative, remedial, purpose to which the civil penalty may rationally be connected. The Legislature has added substance to the remedial purposes of the Act by earmarking the civil penalty funds for public education and training on securities matters. § 58–13B–57. The purpose of the Securities Act is to regulate a lawful and important financial industry so that investors are not deceived or swindled through acts and practices our Legislature believes to be wrongful and harmful to society. The civil penalty, together with the use of penalty funds for education and training, serve that purpose.

{37} Seventh, and finally, our analyses of and conclusions drawn under the first six *Mendoza–Martinez* factors lead us to conclude that imposition of the civil penalty does not appear excessive in relation to the Securities Act's remedial purpose. The Securities Act regulates lawful and often complex transactions in which New Mexico citizens engage for their financial security. Fraudulent practices in securities transactions required the United States Congress as well as states to pass comprehensive regulatory and administrative remedial legislation. The Securities Act's primary purpose is remedial, heavily oriented toward assuring that members of the public are not swindled through deceptive practices. The civil penalty is attached to an important part of the remedial aspect of the Securities Act. In any measurement, it is not a sanction that is out of proportion or excessive when considering the obvious legislative view that an essential, if not the most effective, way to prevent and remedy deceptive practices is through a comprehensive regulatory and administrative legislative scheme.

{38} In sum, our analysis of the *Mendoza–Martinez* analytical framework reveals that: (1) the civil penalty did not impose an affirmative disability or restraint; (2) it has not been historically viewed as punitive; (3) it does not come into play only on a finding of scienter; (4) the civil penalty speaks more to regulating persons dealing in the sale of securities to the public; (5) simply because the conduct to which the civil penalty applies is already a crime is insufficient, by itself, to render the sanction criminally punitive; (6) there is a specific statutory remedial purpose, in addition to the Act's general remedial purpose, to which the civil penalty is connected; and, finally, (7) the civil penalty was not excessive in relation to its remedial purpose. Further, it should not go unnoticed that the Legislature chose to label the penalty a *civil* penalty. § 58–13B–37(B)(4); *see*

*Hudson,* 522 U.S. at 103, 118 S.Ct. 488 (noting that monetary penalties in federal banking statutes expressly provided that the penalties were "civil"); *Ward,* 448 U.S. at 248–49, 100 S.Ct. 2636 (noting that Congress labeled the monetary penalty in the federal statute a "civil penalty," and stating this "label that takes on added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph" of the same section of the statute).

{39} Thus, we conclude that the civil penalty imposed upon Defendant in this matter was not sufficiently punitive in its effect that, on balance, the punitive effect outweighed its remedial effect. *See White Chevy,* 2002–NMSC–014, ¶ 11, 132 N.M. 187, 46 P.3d 94. This conclusion finds good company in cases that use the *Mendoza–Martinez* framework. Although they contain references to federal law that we have rejected here in New Mexico, we find them persuasive nonetheless because of their *Mendoza–Martinez* analysis. *See Hudson,* 522 U.S. at 104–05, 118 S.Ct. 488; *Palmisano,* 135 F.3d at 865–66 (concluding that defendant's double jeopardy right not offended when penalties were "expressly designated as civil," which evinced a clear congressional intent that penalties be classified as civil, and when examination of *Mendoza–Martinez* factors lead to determination that such penalties are not so punitive in effect as would "override Congress's intent to provide for civil penalties"); *Winchester v. Stein,* 135 Wash.2d 835, 959 P.2d 1077, 1085 (1998) (en banc) (applying federal doctrine regarding double jeopardy implications of state's Criminal Profiteering Act and recognizing "that the Legislature may provide for both civil sanctions and criminal penalties in the same statute without thereby converting the civil proceeding to a criminal or penal one").

### Application of *Nunez*

{40} Defendant nonetheless contends the double jeopardy analysis and holding in *Nunez* precludes the imposition of both civil and criminal penalties under the Securities Act and that the New Mexico Constitution's double jeopardy clause and the New Mexico double jeopardy statute "afford greater protections than the federal double jeopardy clause." We conclude, as did the Supreme Court in *White Chevy,* that *Nunez* does not control the result in the present case because *Nunez* "dealt particularly with the provisions of the Controlled Substances Act." *White Chevy,* 2002–NMSC–014, ¶ 9, 132 N.M. 187, 46 P.3d 94. *Nunez* involved statutes aimed at illegal criminal activity. 2000–NMSC–013, ¶ 52, 129 N.M. 63, 2 P.3d 264. It did not involve primarily regulatory and administrative remedial legislation as that with which we are presented in this case. *See id.* (contrasting *Schwartz,* and determining that "[i]n contrast, the statutes applicable to the cases we address today do not concern a regulated lawful activity, but rather an illegal criminal activity"). Further, immediately following its statement that *Nunez* "would not be applicable," *White Chevy* cited two of this Court's cases, *State v. Elliott,* 2001–NMCA–108, ¶ 28, 131 N.M. 390, 37 P.3d 107, and *Astorga,* 2000–NMCA–098, ¶ 7, 129 N.M. 736, 13 P.3d 468. *Elliott* concluded that *Nunez* did not apply to circumstances involving revocation of bail. *Elliott,* 2001–NMCA–108, ¶ 28, 131 N.M. 390, 37 P.3d 107. *Astorga* concluded that *Nunez* did not apply to circumstances involving loss of good time credit in prison. *Astorga,* 2000–NMCA–098, ¶ 7, 129 N.M. 736, 13 P.3d 468. It is reasonable to read the Supreme Court's citation to these cases in *White Chevy* as a further signal of an intention on the part of the Supreme Court to be cautious and circumspect when a party seeks to broaden *Nunez.*

{41} Finally, *White Chevy,* through its dependence on *Hudson,* not only signaled an intent to return to some of the pre-*Halper* case law, *White Chevy* also (1) indicated that the remedial/punitive analysis as to the effect of a civil penalty should include the *Mendoza–Martinez* considerations, and (2) identified *Hudson* as the flagship case by which to analyze whether imposition of both civil monetary penalty and criminal penalty for the same conduct violates double jeopardy, provided that the analysis does not run afoul of the doctrines specifically rejected in *Nunez.* For these reasons, we decline to afford Defendant greater constitutional protection through the analysis and holding in *Nunez.*

We are not persuaded that *Nunez* or our State constitutional and statutory double jeopardy provisions require a result different than that we reach in this opinion.

## *COLLINS* BACKGROUND AND DISPOSITION

{42} Defendants Joseph Clyde Collins and Joy E. Collins, husband and wife, operated an osteopathic clinic in Otero County, New Mexico. They gave promissory notes to many patients in exchange for money. In September 1998, Defendants were relieved by a bankruptcy court of their legal obligation to repay the notes. That court also determined that Defendants did not commit fraud in the issuance of the notes.

{43} In May 2000, following an administrative hearing for securities fraud, and findings of numerous violations of the Securities Act, the acting director of the Securities Division entered an order barring Defendants from association with any broker-dealer or investment advisor in New Mexico and ordered each Defendant to pay a civil penalty of $50,000 and investigative costs of $1000. However, the Division determined that the bankruptcy court order barred the imposition of the penalties and cost assessment and the acting director modified the administrative order by rescinding that portion imposing the penalties and cost assessment. In the interim, the Division made no effort to collect the penalties. Defendants have not paid the civil penalties or cost assessment.

{44} A grand jury indicted Defendants in February 2001, based on the identical statutes that the hearing officer in the administrative proceeding had determined Defendants violated. In October 2001, Defendants moved to dismiss the indictment on the ground of double jeopardy. In November 2001, the Division filed the order in which it amended its May 2000 administrative order to remove the civil penalties and cost assessment. There appears to be a difference of opinion between the Division and Defendants as to the reason for this amendment. The Division states that it amended the order based on legal advice that the bankruptcy court order barred the imposition of the penalties and cost assessment. Defendants indicate that the Division amended the order so it could proceed with the criminal case against Defendants.

{45} In January 2002, the district court in the criminal case applied *Nunez* and dismissed the criminal charges. The court determined that the State could not subject Defendants to a second, separate proceeding for the same conduct, under the same statutes, after punishment was already ordered pursuant to entry of the administrative order. In particular, the court determined that the civil penalties were "primarily punitive in nature and therefore do constitute penalties under the third prong of the [*Schwartz*] double jeopardy test." While finding that "[t]he 'Education and Training Fund' is in the public interest and is remedial in nature," the court also found that "[t]he civil penalties … are primarily punitive in nature and any remedial quality of the penalties is outweighed by the punitive nature of the penalties."

{46} For the reasons we set out in our discussion and disposition of *Kirby*, declining to extend *Nunez*, we reverse *Collins*.

## ISSUES NOT ADDRESSED

{47} Based on our holdings in *Kirby* and *Collins*, we need not address, and therefore do not address, the issue raised by the State in both *Kirby* and *Collins* that Defendants were not placed in jeopardy, due to the unenforced status of the civil penalty, including its argument that the Division had to reduce its administrative order to judgment in district court. Similarly, we do not address the State's suggestion in *Kirby* that reversal is required because New Mexico courts are allowing themselves to somehow be wrongfully manipulated.

## CONCLUSION

{48} We reverse *State v. Kirby* and *State v. Collins*. The criminal prosecutions under the Securities Act, following administratively imposed civil penalties under that Act, do not place Defendants in double jeopardy under the New Mexico Constitution or under Section 30-1-10.

{49} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and IRA ROBINSON, Judges.