**Certiorari Granted, May 3, 2011, No. 32,941**

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMCA-038

Filing Date: March 9, 2011

Docket No. 29,461

VICTOR A. TITUS and THE TITUS &
MURPHY LAW FIRM,

   Petitioner-Appellant,

v.

CITY OF ALBUQUERQUE,

   Respondent-Appellee.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Alan Malott, District Judge

Titus & Murphy Law Firm
Victor A. Titus
Farmington, NM

for Appellant

City of Albuquerque
Robert M. White, City Attorney
Michael I. Garcia, Assistant City Attorney
Albuquerque, NM

for Appellee

**OPINION**

**CASTILLO, Judge.**

**{1}**     The City of Albuquerque (Albuquerque) originally enacted the Safe Traffic Operations Program (STOP) in 2005. Albuquerque, N.M., Ordinances ch. 7, art. XI, §§ 7-11-1 to -6 (2005) (as amended through 2009). Commonly referred to as the red light camera

1

program, STOP involves the use of video detection equipment to monitor compliance with traffic signals and speed limits within the city. Violators are issued monetary fines. Victor A. Titus and the Titus and Murphy Law Firm (together referred to as Titus) are the appellants in this case. Titus was issued two separate fines for speeding, and both were upheld by a STOP hearing officer. Titus appealed to the district court and the hearing officers' decisions were affirmed. Titus now appeals from the district court's determination. We affirm.

## I. BACKGROUND

{2} Red-light camera technology is relatively new. First introduced in Europe in the 1960s and 1970s, red light camera programs slowly expanded and, by the early 1980s, many other countries including Australia, Canada, and Israel, among others adopted the technology. Joel A. Christensen, Note, *Wrong on Red: The Constitutional Case Against Red-light Cameras*, 32 Wash. U. J.L. & Pol'y 443 (2010). In 1994, New York City was the first American municipality to use this technology. *Id.* Currently, there are red-light camera programs operating in more than four hundred American communities. *Id.* Albuquerque is one of these communities.

{3} The case before us deals with two speeding violations that allegedly occurred in Albuquerque and were observed by video detection equipment—one on October 1, 2006, and the other on August 30, 2007. Two separate vehicles were involved, and both were registered to Titus. Titus received notice of the alleged violations and the monetary fines associated with the violations, and he responded by requesting an administrative hearing in both cases.

{4} At those hearings, Titus did not contest the fact that the video equipment observed vehicles registered in his name speeding on the dates in question. Rather, Titus argued that he was not the driver of those vehicles and submitted evidence that he was not in Albuquerque on those dates. Titus's arguments were unavailing; STOP specifically provides that the registered owner of the vehicle observed violating STOP is strictly and vicariously liable for the violation. *See* Albuquerque, N.M., Ordinances ch. 7, art. XI, § 7-11-5(B). Titus also did not pursue any of the defenses recognized in STOP, *see* § 7-11-5(G), and he specifically declined to avail himself of the nomination defense. *See* §§ 7-11-5(D)(3) & (G). That is, Titus was unwilling or unable to nominate, or identify, the individual who was driving his vehicles on the dates of the violations.

{5} The hearing officer found that the vehicles registered to Titus violated STOP on the dates in question and ordered Titus to pay one hundred dollars for each violation. Titus appealed both decisions to the district court where he attacked the legality and constitutionality of STOP. The violations were consolidated and the hearing officer's decisions were affirmed.

## II. DISCUSSION

2

**{6}** On appeal, Titus raises four issues: (1) whether STOP requires Albuquerque to prove the identity of the driver; (2) whether STOP is contrary to New Mexico's public nuisance statute; (3) whether STOP is preempted by the Motor Vehicle Code (MVC); and (4) whether STOP violates the New Mexico Constitution. We take each issue in turn.

**{7}** As a preliminary matter, we address the proper ordinance to be considered. Titus submitted only a partial copy of the STOP ordinance into the record proper, and that copy of the ordinance includes amendments through 2006. Albuquerque submitted a complete version of the ordinance as a supplement to the record proper, and that copy includes amendments through 2008. There are material differences between the 2006 and 2008 versions of the ordinance. The 2006 ordinance provides Albuquerque authority to seize vehicles "in the city with unpaid STOP fines" and to commence forfeiture proceedings against those vehicles. *See* Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-5(I) (2006). Albuquerque no longer retains this authority under the 2008 ordinance; the provisions granting Albuquerque this authority were removed from STOP through the 2008 amendments. In addition, the 2008 amendments significantly reduced the fines associated with STOP violations. *Compare* Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-5(H) (2006) *with* Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-5(H) (2008).

**{8}** At oral argument, the Court noted that the parties submitted different versions of the ordinance and asked for clarification as to which version of the ordinance controlled in light of the dates of Titus's violations. The parties agreed that the version of STOP submitted by Albuquerque controlled. For the following reasons, we hold the parties to this agreement.

**{9}** Typically, parties are bound by their stipulations. *See Martinez v. Eight N. Indian Pueblo Council, Inc.*, 1997-NMCA-078, ¶ 16, 123 N.M. 677, 944 P.2d 906. Additionally, Titus's arguments implicate provisions within the STOP ordinance, specifically the findings and intent provisions that Titus failed to submit into the record proper, and Titus has not argued that the findings and intent section of STOP changed materially between 2006 and 2008. Finally, Titus makes only one argument that is contingent on language found only in the 2006 version of the statute: that STOP is unconstitutional because of the forfeiture and seizure provisions. As we explain below, that argument is not ripe for review. Accordingly, we will rely on the version of the STOP ordinance submitted by Albuquerque that includes amendments through 2008.

## A. Standard of Review

**{10}** "Interpretation of an ordinance is a matter of law subject to our de novo review using the same rules of construction applicable to statutes." *Kirkpatrick v. Bd. of County Comm'rs of Santa Fe County*, 2009-NMCA-110, ¶ 11, 147 N.M. 127, 217 P.3d 613. We review questions involving statutory interpretation, preemption, and constitutional challenges de novo. *See Oldham v. Oldham*, 2009-NMCA-126, ¶ 5, 147 N.M. 329, 222 P.3d 701 ("We review the district court's statutory interpretation and conclusions of law de novo."), *cert.*

*granted*, 2009-NMCERT-011, 147 N.M. 464, 225 P.3d 794; *Weise v. Washington Tru Solutions, L.L.C.*, 2008-NMCA-121, ¶ 9, 144 N.M. 867, 192 P.3d 1244 ("Whether a state claim is preempted by federal law is a legal question that we review de novo."); *ACLU of N.M. v. City of Albuquerque* (*ACLU I*), 2006-NMCA-078, ¶ 10, 139 N.M. 761, 137 P.3d 1215 ("We review constitutional challenges de novo.").

## B.     Identity of the Driver

{11}     Titus contends that Albuquerque should be required to prove the identity of the driver and should not be allowed to enforce a STOP violation against anyone other than the actual driver responsible for committing the violation. This is not, however, the law under STOP. Section 7-11-5(B) of STOP focuses on the vehicle that is observed committing the STOP violation and makes the registered owner of that vehicle strictly and vicariously liable for the monetary fine associated with the violation. Section 7-11-5(D)(3) allows vehicle owners like Titus, who deny they were driving the vehicle at the time of the violation, to disclaim responsibility for the offense and to nominate the actual driver. Section 7-11-5(G) allows the vehicle owner to assert any defense available at law including, but not limited to, that the vehicle was stolen, that the vehicle was being driven without permission, or that the title to the vehicle had been transferred. As noted above, Titus declined to nominate the actual driver of each vehicle or pursue any of these defenses.

{12}     Titus claims that holding vehicle owners strictly and vicariously liable for STOP violations renders the ordinance internally inconsistent such that this Court should neither "sanction" nor "endorse" STOP, and he asks that we strike the ordinance down as written. Titus points to language in the findings and intent section of STOP—specifically the section stating that STOP was enacted to abate the threat posed by drivers who violate speed limits and who fail to comply with traffic signals. According to Titus, this language conflicts with the enforcement provisions of STOP that render vehicle owners strictly liable for the drivers' violations.

{13}     We do not see the conflict in these provisions. The owner of a vehicle generally controls who drives the vehicle and is, in many if not most instances, also the driver. Furthermore, and as previously described, in the event the owner is not the driver, STOP provides procedural mechanisms that permit vehicle owners to disclaim responsibility for the STOP violation and to avoid penalty. We are unpersuaded by Titus's objections to the nomination process. Other than the naked assertion that the nomination process is "offensive to the American value of fundamental fairness," Titus fails to cite any authority that casts doubt upon the legality of requiring a vehicle owner who denies responsibility for a STOP violation to nominate the party responsible or accept the fine. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (this Court will not consider propositions that are unsupported by citation to authority).

## C.     The New Mexico Nuisance Statute

4

**{14}** Titus next argues that STOP impermissibly declares a single act of speeding or running a red light a nuisance. Such conduct, according to Titus, cannot constitute a nuisance under New Mexico law. Alternatively, Titus contends that, even if Albuquerque is allowed to declare a single instance of speeding or a single red light infraction a nuisance, Albuquerque may not enforce STOP against him because he did not commit the nuisance. We examine these arguments in turn.

**{15}** Albuquerque is a home rule charter municipality. The New Mexico Constitution provides home rule municipalities with the right to exercise all legislative powers not expressly denied by general law or charter. *Smith v. City of Santa Fe*, 2006-NMCA-048, ¶ 8, 139 N.M. 410, 133 P.3d 866 (citing N.M. Const. art. X, § 6(D)). "A municipality, including a home rule municipality that has adopted a charter pursuant to Article 10, Section 6 of the [C]onstitution of New Mexico, may by ordinance . . . define a nuisance, abate a nuisance and impose penalties upon a person who creates or allows a nuisance to exist[.]" NMSA 1978, § 3-18-17(A) (2009). Through STOP, Albuquerque defined speeding and red light infractions nuisances. *See* Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-1(A) & (D). The issue is whether Albuquerque had authority to do so.

**{16}** "[T]o constitute a thing a legal nuisance it must be so in fact, irrespective of an ordinance declaration on the subject." Eugene McQuillin, *The Law of Municipal Corporations* § 24:68, at 263 (3d. ed. rev. vol. 2007). New Mexico conforms to the common-law and recognizes two types of nuisance: private and public. *Id.* at § 24:62, 237; *City of Albuquerque v. State ex rel. Vill. of Los Ranchos de Albuquerque*, 111 N.M. 608, 611, 808 P.2d 58, 61 (Ct. App. 1991). "A private nuisance has been defined as a non-trespassory invasion of another's interest in the private use and enjoyment of land." *Padilla v. Lawrence*, 101 N.M. 556, 559, 685 P.2d 964, 967 (Ct. App. 1984). This concept is inapplicable here; our focus is solely on the concept of public nuisances.

**{17}** "A public nuisance is one which adversely affects public health, welfare, or safety." *Id.* at 562, 685 P.2d at 970. This form of nuisance "affects the rights of citizens as part of the public and must affect a considerable number of people or an entire community or neighborhood." *Id.* "It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large." *State ex rel. Vill. of Los Ranchos v. City of Albuquerque*, 119 N.M. 150, 163, 889 P.2d 185, 198 (1994) (internal quotation marks and citation omitted). In New Mexico, public nuisances are divided into two categories: nuisances per se and nuisances in fact. *Id.* at 164, 889 P.2d at 199.

> A nuisance per se is an activity, or an act, structure, instrument, or occupation which is a nuisance at all times and under any circumstances, regardless of location or surroundings. A nuisance in fact is described as an activity or structure which is not a nuisance by nature, but which becomes so because of such factors as surroundings, locality, and the manner in which

5

it is conducted or managed.

*City of Sunland Park v. Harris News, Inc.*, 2005-NMCA-128, ¶ 40, 138 N.M. 588, 124 P.3d 566 (internal quotation marks and citation omitted). "[T]he determination that something is a nuisance per se is a question of law for the court, and the determination of whether that which is not in itself a nuisance is a nuisance in fact is a question for the jury or the judge as trier of fact." *Wernke v. Halas*, 600 N.E.2d 117, 120 (Ind. Ct. App. 1992) (internal quotation marks, emphasis, and citation omitted).

**{18}** New Mexico has a public nuisance statute, *see* NMSA 1978, § 30-8-1 (1963), and both Titus and Judge Vigil in his dissent contend that Albuquerque's authority to declare a public nuisance is limited by this statute. We do not agree. "Public nuisance has its roots in English common law." *State ex rel. Smith v. Riley*, 1997-NMCA-063, ¶ 5, 123 N.M. 453, 942 P.2d 721 (internal quotation marks and citation omitted). Section 30-8-1 is a criminal statute barring public nuisance and imposes a misdemeanor penalty for "knowingly creating, performing or maintaining" a public nuisance. *Riley*, 1997-NMCA-063, ¶ 5. We have construed Section 30-8-1 as encompassing the common law prohibitions. *Riley*, 1997-NMCA-063, ¶ 5; McQuillin, *supra* § 24:60, at 231-32 (observing that "[l]egislation concerning nuisances is . . . to be construed as embracing common-law principles"). Section 30-8-1 identifies the consequences of knowingly committing a public nuisance, *see Espinosa v. Roswell Tower, Inc.*, 1996-NMCA-006, ¶ 9, 121 N.M. 306, 910 P.2d 940 (observing that statutory public nuisance requires knowledge whereas common law nuisance requires no element of knowledge), it does not govern what things may constitute public nuisances. What constitutes a public nuisance is governed by common law principles. Section 30-8-1 is relevant here only to the extent that it assists us in understanding the contours of the common law principles that govern. *See Vill. of Los Ranchos*, 119 N.M. at 163, 889 P.2d at 198 ("The common law public nuisance is similar to the New Mexico public nuisance statute[.]").

**{19}** Having identified the common law principles governing public nuisances, we now examine whether Albuquerque's decision to designate speeding and red light infractions nuisances is consistent with that law. In doing so, we are mindful of the fact that when a municipality determines that certain conduct or conditions constitute a public nuisance, that decision is entitled to substantial deference. *See Green v. Town of Gallup*, 46 N.M. 71, 72, 75, 120 P.2d 619, 619, 621 (1941) (upholding a Gallup ordinance that declared "soliciting orders for the sale of goods, wares, and merchandise, or for the purpose of disposing of or peddling or hawking the same" within Gallup by "solicitors, peddlers, hawkers, itinerant merchants, and transient vendors of merchandise" a nuisance and stating that the Court "will not interfere with [the] city's determination regarding [the] reasonableness of its public health regulations unless it is plain and palpable that there is no real or substantial relation between the ordinance and its object" (internal quotation marks and citation omitted)); *Mitchell v. City of Roswell*, 45 N.M. 92, 98, 111 P.2d 41, 44 (1941) (upholding a Roswell ordinance which declared the keeping of livestock within specified areas of the city a nuisance and instructing that "[i]t is the policy of the courts to uphold regulations intended

6

to protect the public health, unless it is plain that they have no real relation to the object for which ostensibly they were enacted, and prima facie they are reasonable"). Moreover, "[m]unicipal ordinances declaring what constitutes nuisances and a municipal determination that something is a nuisance presumptively are correct, and the burden of proof of the contrary is on one asserting it." McQuillin, *supra* § 24:60, at 233.

**{20}** The Albuquerque City Council's (Council) determination that red light violations and speeding are public nuisances was premised on several findings which are memorialized in STOP. Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-1. The Council found that "there is a significant risk to the health and safety of the community from drivers who run red lights and exceed posted speed limits." Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-1(A). As to red light infractions, the Council found that "red light violations are a matter of unique local concern in Albuquerque, in part, because of the high traffic volume and crowded intersections." *Id.* Furthermore, the Council found that "Albuquerque has one of the highest fatality and serious injury rates in the nation resulting from red light violations and blatant disregard by drivers for existing state red light laws," *id.*, that "[r]ed light violations are causally connected to death and serious injury to a degree not evident with regard to other traffic infractions," and that "[r]ed light violations kill far too many of our citizens." Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-1(C). As to speeding, the Council found that "drivers in Albuquerque repeatedly violate posted speed limits," Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-1(D), and that the "state law against speeding is inadequate to preserve public safety in Albuquerque." *Id.* The Council observed that "many states and municipalities across the country have experienced decreases in red light violations by using red light cameras" and that this technology "save[s] lives." *Id.* Accordingly, the Council concluded that the use of red light cameras and the implementation of photographic and electronic equipment to enforce speed limits would abate these nuisances. *Id.*

**{21}** Titus has not provided us a sufficient basis to question Albuquerque's determination that speeding and red light infractions are legitimate menaces to the health and safety of the citizens of Albuquerque. Indeed, our Supreme Court has previously stated that "[t]he automobile is a dangerous instrumentality and the improper use thereof creates a likelihood of serious menace to public safety and authorizes the most stringent use of the government's police power." *Johnson v. Sanchez*, 67 N.M. 41, 46-47, 351 P.2d 449, 452 (1960). The Council's findings prove that speeding and red light infractions are nuisances per se. Given the Council's findings, we can think of no circumstance where speeding or violating stop lights in Albuquerque would not pose a threat to the safety of the citizens of Albuquerque. Accordingly, we conclude that Albuquerque acted within its municipal authority as provided in Section 3-18-17(A) in enacting STOP and designating speeding and red light infractions nuisances.

**{22}** We are unpersuaded by Titus's assertion that STOP overreaches because it declares a single act of speeding or a single red light infraction a public nuisance. The Council's findings indicate that STOP was enacted because individual indifference to basic traffic laws

7

in Albuquerque has, in the aggregate, resulted in a serious threat to the health and safety of the citizenry of Albuquerque. It is both sensible and reasonable that STOP attempts to abate that threat by deterring individual drivers from acting with indifference toward basic traffic laws.

{23}    We are equally unpersuaded by Titus's claims that STOP is defective because it is primarily a money making scheme and, thus, not a legitimate exercise of Albuquerque's authority under Section 3-18-17(A). The Seventh Circuit rejected a comparable argument as follows:

> [t]hat [Chicago's electronic traffic law enforcement] system raises revenue does not condemn it. Taxes, whether on liquor or on running red lights, are valid municipal endeavors. Like any other exaction, a fine does more than raise revenue: It also discourages the taxed activity. A system that simultaneously raises money and improves compliance with traffic laws has much to recommend it[.]

*Idris v. City of Chicago*, 552 F.3d 564, 566 (7th Cir. 2009). This reasoning applies with equal force here.

{24}    We turn now to Titus's argument in the alternative: that even if Albuquerque may declare speeding and red light infractions public nuisances, Albuquerque may not impose the penalty provisions of STOP against him because he was not responsible for the conduct that constituted the nuisance. Titus's contention is premised on the language of Section 3-18-17(A) that states that a municipality may "abate a nuisance and impose penalties upon a person who *creates or allows* a nuisance to exist[.]" (Emphasis added.) Titus asserts that he neither created nor allowed the two instances of speeding to exist and, thus, Albuquerque may not impose the STOP fines against him. We do not agree.

{25}    We decline to read the words create or allow in Section 3-18-17(A) as restricting Albuquerque's authority to impose penalties upon only the driver of a vehicle observed violating STOP. In our view, it is sufficient that Titus is the registered owner of the vehicles that were speeding and proffered no defense. *Cf. Idris*, 552 F.3d at 566 (discussing the vicarious liability provision of Chicago's electronic traffic law enforcement ordinance, observing that "[l]egal systems often achieve deterrence by imposing fines or penalties without fault," and concluding that making vehicle owners vicariously liable for traffic offenses captured by electronic monitoring equipment was "rational [because] . . . [o]wners will take more care when lending their cars, and often they can pass the expense on to the real wrongdoer"). In this regard, Titus necessarily created and allowed the speeding to exist as it was his vehicles that committed the violations and his control over those vehicles has never been questioned.

{26}    In his dissent, Judge Vigil takes Titus's argument in the alternative one step further. Judge Vigil focuses on Section 7-11-5(B) which, as noted, provides that "[t]he registered

[vehicle] owner is strictly and vicariously liable for the violation unless one of the exceptions herein applies," and concludes that this feature of the ordinance compels the conclusion that STOP is contrary to state law. Dissent, ¶¶ 55, 59. Judge Vigil observes that the concepts of strict and vicarious liability are not defined in STOP but typically assume fault irrespective of any wrongful conduct on the part of the actor. Dissent, ¶ 57. He then points out, just as Titus does, that Section 3-18-17(A) provides Albuquerque with authority to impose penalties only upon individuals who create or allow nuisances to exist. Dissent, ¶¶ 57-59. In Judge Vigil's view, strict and vicarious liability are conceptually incompatible with the language of Section 3-18-17(A) and, thus, STOP is void. Dissent, ¶ 59. We disagree.

**{27}** Vehicle owners are strictly and vicariously liable for STOP violations *unless* a defense applies. Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-5(B). As we previously pointed out, vehicle owners may nominate the actual driver or submit any defenses available at law including, but not limited to, that the vehicle was stolen, that the vehicle was being driven without the owner's knowledge or permission, or that title to the vehicle was transferred. Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-5(D)(3) & (G). That a vehicle owner may assert these defenses illustrates that the strict and vicarious liability provision of STOP is limited. Vehicle owners are held strictly and vicariously liable only for those STOP violations for which they are unable or unwilling to prove a defense, or where they are unsuccessful in asserting a defense. In those circumstances, imposition of strict and vicarious liability is perfectly consistent with Section 3-18-17(A) as there is nothing to disprove that the vehicle owner created or allowed the nuisance to exist. The owner retained control over access to and use of the vehicle, and the vehicle was used in a manner that violated STOP.

**{28}** Judge Vigil also contends that the defenses provided in STOP are "empty" and points out that vehicle owners remain liable for a violation even if they nominate a driver and are required to pay the violation where the nominee appeals, denying they were the driver, or defaults. Dissent, ¶ 62. *See* Albuquerque, N.M. Ordinances ch. 7, art. XI, § 7-11-5(D)(3). We do not agree that the defenses provided in STOP are empty, nor do we agree that STOP is incompatible with Section 3-17-18 because vehicle owners are held ultimately responsible for STOP violations carried out by others. "[D]riving is a privilege, and not a right." *ACLU v. City of Albuquerque* (*ACLU III*), 2007-NMCA-092, ¶ 17, 142 N.M. 259, 164 P.3d 958. As we have already explained, vehicle owners ultimately control their vehicles, and they create or allow the nuisance of speeding or a red light violation to exist by allowing a driver who commits these offenses use of their vehicles.

**{29}** Finally, we are also unpersuaded by Titus's procedural objections. Titus claims that NMSA 1978, Section 30-8-8(B) (1963) precludes Albuquerque from enforcing STOP and abating a nuisance through a process that involves an administrative hearing before a city-appointed hearing officer. Section 30-8-8(B) states that

> [a] civil action to abate a public nuisance may be brought, by verified

complaint in the name of the state without cost, by any public officer or private citizen, in the district court of the county where the public nuisance exists, against any person, corporation or association of persons who shall create, perform or maintain a public nuisance.

Titus's contention that STOP violates Section 30-8-8(B) is not borne out by the terms of the statute. The statute states that an abatement action "may" be brought in district court. We do not interpret the term "may" as requiring an action to be brought in district court. *Cf. Thriftway Mktg. Corp. v. State*, 114 N.M. 578, 580, 844 P.2d 828, 830 (Ct. App. 1992) ("We think it is clear that the word 'may' . . . was intended by the [L]egislature to invest the director with discretion[.]"). The statute does not preclude the abatement action from first being brought in an administrative setting with express allowance for an appeal to the district court as is provided in STOP. *See* Albuquerque, N.M., Ordinances ch. 7, § 7-11-5(F).

**{30}** Titus also asserts that administrative enforcement of STOP is contrary to NMSA 1978, Section 34-8A-3(A)(1) (2001), which provides that the metropolitan court "shall have jurisdiction within the county boundaries over all . . . offenses and complaints pursuant to ordinances of the county and of a municipality located within the county in which the court is located." However, Titus devotes only two sentences to this claim and cites no authority to support his argument. This Court has no duty to review an argument that is not adequately developed. *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (declining to entertain a cursory argument).

## D. Preemption

**{31}** Titus next claims that STOP violations are "properly" MVC violations that are triable in Bernalillo County Metropolitan Court as criminal offenses. Titus cites the speeding statute in the MVC, NMSA 1978, § 66-7-301 (2002), as proof of this claim and argues that STOP is thereby preempted by the MVC. We are unpersuaded.

**{32}** "A municipality may adopt ordinances not inconsistent with the laws of the state for the purpose of providing for the safety, preserving the health, promoting the prosperity and improving the morals, order, comfort and convenience of the municipality and its inhabitants." *ACLU I*, 2006-NMCA-078, ¶ 12 (internal quotation marks and citation omitted). "A local governmental body's ability to regulate in an area may be preempted either expressly, by the language of a statute, or impliedly, due to a conflict between the local body's ordinances and the contents, purposes, or pervasive scheme of the statute." *San Pedro Mining Corp. v. Bd. of County Comm'rs of Santa Fe County*, 1996-NMCA-002, ¶ 9, 121 N.M. 194, 909 P.2d 754. "A local government is presumed to retain the power to exercise its normal authority over an activity, so the intention of the [L]egislature to preempt local control must be clearly stated if express preemption is to result." *Id.* "Even in the absence of express preemption by the [L]egislature, a county ordinance may be preempted if it conflicts with a state statute or regulation, or if the statute demonstrates an intent to occupy the entire field." *Id.* ¶ 11.

10

**{33}** Aside from merely pointing out that the MVC has a provision that governs speeding and establishes fines for speeding, Titus has failed to explain how STOP is expressly or impliedly preempted by the MVC. Our research reveals that the MVC does indeed include provisions limiting the power of local authorities to regulate traffic. *See* NMSA 1978, § 66-7-8 (1978) ("The provisions of Article 7 of Chapter 66 NMSA 1978 shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein and no local authority shall enact or enforce any ordinance, rule or regulation in conflict with such provisions unless expressly authorized herein."). However, the MVC also expressly provides that local authorities retain the power to "adopt additional traffic regulations which are not in conflict with such provisions." *Id.*

**{34}** In *Board of Commissioners of Rio Arriba County v. Greacen*, 2000-NMSC-016, ¶¶ 15-16, 129 N.M. 177, 3 P.3d 672, our Supreme Court established the test to determine whether a municipal traffic regulation is preempted by the MVC. That test is whether "the ordinance permits an act the general law prohibits, or vice versa." *Id.* ¶ 16. Alternatively, the Court described the test in the following manner: "there [is] no invasion of [s]tate statutory authority where the local ordinance merely complements the statute and is nowhere antagonistic therewith." *Id.* (internal quotation marks and citation omitted).

**{35}** STOP does not permit an act prohibited by the MVC or vice versa. Albuquerque enacted STOP because the Council found that state laws were insufficient in deterring speeding and red light infractions in the city limits. Albuquerque, N.M., Ordinances ch. 7, art. XI, § 7-11-1. The penalties for violating STOP are "purely civil and not criminal in nature." Albuquerque, N.M., Ordinances ch. 7, art. XI, § 7-11-1(F). Language in the ordinance states that STOP neither abrogates nor impairs "enforcement of existing traffic laws." Albuquerque, N.M., Ordinances ch. 7, art. XI, § 7-11-5(A). In our view, STOP does not conflict with the MVC or invade the state's statutory authority to regulate traffic under the MVC. STOP merely provides civil monetary penalties for conduct that is also a criminal offense under the MVC. Those civil monetary penalties do nothing to upend the MVC. Accordingly, we reject Titus's assertion that STOP is preempted by the MVC.

**{36}** Titus argues that, despite the fact that the text of STOP indicates that STOP is civil remedial legislation, it is in fact a criminal statute. We disagree. In *State v. Kirby*, 2003-NMCA-074, ¶ 27, 133 N.M. 782, 70 P.3d 772, this Court discussed "the test for determining whether a statutory scheme create[s] a civil remedy or criminal penalty." (Internal quotation marks and citation omitted.) The inquiry is "whether the statutory scheme [is] so punitive either in purpose or effect . . . as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty." *Id.* ¶ 28 (second and third alterations in original) (internal quotation marks and citation omitted). We employ a seven-factor, non-exhaustive analytical framework to resolve this inquiry. *Id.* That framework includes

> (1) [w]hether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will

11

promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Id.* (alteration in original) (internal quotation marks and citation omitted). We apply this analysis to the matter before us.

**{37}** First, penalties associated with a STOP violation "[do] not impose an affirmative disability or restraint." *Id.* ¶ 30 (internal quotation marks and citation omitted). A modest fine is neither "harsh" nor carries with it "the stigma of a criminal conviction." *Id.* Second, the penalty for a STOP violation is purely monetary. Albuquerque, N.M., Ordinances ch. 7, art. XI, § 7-11-5(H). Historically, monetary penalties have not been regarded as punishment but are traditionally a form of civil remedy. *Kirby*, 2003-NMCA-074, ¶ 31. Third, scienter is not necessary to find a violation of STOP. Fourth, STOP is a nuisance abatement statute. The intent of STOP is to deter conduct deemed a nuisance. Deterrence may serve civil goals. *Id.* ¶ 34. Fifth, despite the fact that speeding and failing to comply with traffic signals are punishable under the MVC as criminal offenses, we find this insufficient to render the monetary penalties associated with a STOP violation criminally punitive. *See id.* ¶ 35 ("[I]t is clear that the conduct upon which the civil penalty was based also formed the basis of [the d]efendant's indictment [, and] . . . [t]his fact is insufficient to render the money penalties . . . criminally punitive." (third alteration in original) (internal quotation marks and citation omitted)). Sixth, the civil penalties associated with a STOP violation are rationally connected to an alternative remedial purpose: abating a nuisance. Seventh, and finally, imposition of a modest fine is not excessive in relation to the purpose of STOP. Accordingly, we conclude that the civil penalties associated with STOP violations are not sufficiently punitive as to outweigh the civil remedial effect. *Id.* ¶ 39.

## E.    Constitutionality

**{38}** Titus raises a number of challenges to the constitutionality of STOP under the New Mexico Constitution. "In reviewing constitutional attacks, there exists a presumption of constitutionality, and the party attacking the constitutionality of the statute has the burden of proving the statute is unconstitutional beyond all reasonable doubt." *ACLU I*, 2006-NMCA-078, ¶ 10 (internal quotation marks and citation omitted). We divide Titus's constitutional challenges into three categories. In the first category, we consider Titus's contention that his procedural due process rights have been violated. In the second category, we address Titus's challenge to forfeiture. And in the third category, we address Titus's remaining constitutional arguments that are either unclear, inadequately developed, or unsupported by authority.

### 1.    Due process

**{39}**   Titus argues that STOP violates his right to procedural due process under Article II, Section 18 of the New Mexico Constitution. Article II, Section 18 "prohibits the denial of life, liberty or property without due process of law." *Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 25, 122 N.M. 524, 928 P.2d 250. "Due process involves both substantive and procedural considerations." *Id.* Titus raises only procedural due process arguments.

**{40}**   "Procedural due process requires the government to give notice and an opportunity to be heard before depriving an individual of liberty or property." *Id.* "Before a procedural due process claim may be asserted, the plaintiff must establish that he was deprived of a legitimate liberty or property interest and that he was not afforded adequate procedural protections in connection with the deprivation." *Bd. of Educ. v. Harrell*, 118 N.M. 470, 477, 882 P.2d 511, 518 (1994).

**{41}**   Titus identifies the property interest as the monetary fine and the potential forfeiture of his vehicle. A monetary fine alone is a sufficient property interest. *See Shavitz v. City of High Point*, 270 F. Supp. 2d 702, 709 (M.D.N.C. 2003) (concluding that a fifty dollar fine resulting from a red light infraction observed by a traffic camera constituted a legitimate property interest for purposes of procedural due process analysis). Thus, we turn to the adequacy of the procedural protections.

**{42}**   "Due process requires that the proceedings looking toward a deprivation be essentially fair." *Harrell*, 118 N.M. at 478, 882 P.2d at 519.

> The essential elements of the adversary process, some or all of which may be required as part of the due process afforded an individual when the government deprives him of life, liberty, or property through the action of a state agency, are:
>
>> (1) adequate notice of the charges or basis for government action; (2) a neutral decision-maker; (3) an opportunity to make an oral presentation to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; (7) a decision based on the record with a statement of reasons for the decision.

*Id.* (internal quotation marks and citation omitted). Many of these essential elements of the adversary process are extended to individuals charged with STOP violations.

**{43}**   Albuquerque, N.M., Ordinances ch. 7, § 7-11-5(C)(1) of STOP instructs that vehicle owners charged with a violation of STOP are entitled to receive notice of the violation along with detailed information about the basis for the charge. Thereafter, Albuquerque, N.M.,

13

Ordinances ch. 7, § 7-11-5(D) specifies that vehicle owners are entitled to a hearing before an impartial hearing officer at no cost. Albuquerque, N.M., Ordinances ch. 7, § 7-11-5(F) places the burden to prove the violation on the Department. Albuquerque, N.M., Ordinances ch. 7, § 7-11-5(F) further directs that the vehicle owner is entitled to hear as well as challenge the evidence and that the hearing officer is required to render a decision in writing. Albuquerque, N.M., Ordinances ch. 7, § 7-11-5(F) permits the owner to appeal to the district court and to recover costs if the appeal is successful. We are persuaded that these procedural protections are sufficiently adequate to support the conclusion that the enforcement procedures of STOP are "essentially fair." *See Harrell*, 118 N.M. at 478, 882 P.2d at 519 ("Due process considerations are flexible; the circumstances of the case determine the requirements."). We reject Titus's contention that STOP violates his procedural due process rights under Article II, Section 18 of the New Mexico Constitution.

## 2. Forfeiture

**{44}** Titus next contends that STOP violates Article II, Section 10 of the New Mexico Constitution. Article II, Section 10 protects citizens of New Mexico from "unreasonable searches and seizures." N.M. Const. art. II, § 10. Titus's argument that STOP violates Article II, Section 10 is based on the fact that the 2006 version of the STOP ordinance authorizes the seizure of and commencement of forfeiture proceedings against any vehicle for which there exists a record of unpaid STOP fines. As we previously noted, the version of STOP that the parties have agreed is controlling does not include a seizure or forfeiture provision. Moreover, this issue is not ripe as there is no evidence that Titus's vehicle was ever subject to seizure or forfeiture. *See Manning v. N.M. Energy, Minerals & Natural Res. Dep't*, 2006-NMSC-027, ¶ 54, 140 N.M. 528, 144 P.3d 87 (Minzner, J., dissenting) ("The basic purpose of ripeness law is and always has been to conserve judicial machinery for problems which are real and present or imminent, not to squander it on abstract or hypothetical or remote problems." (internal quotation marks and citation omitted)).

## 3. Remaining arguments

**{45}** Titus claims that STOP is overbroad. Specifically, Titus points to the STOP requirement that a vehicle owner may have to pay the fine associated with a STOP violation despite the fact that he or she was not driving the vehicle. Titus has failed to explain how this argument implicates the overbreadth doctrine. Instead, Titus cites to *ACLU II*, 1999-NMSC-044, and states that "[f]or the same reason the courts stopped the city from enforcing the curfew ordinance so too should the ordinance in question be 'stopped.'" Titus has not adequately explained why or how his case and *ACLU II* are similar or whether the conclusion in *ACLU II* is applicable or appropriate here.

**{46}** Titus next argues that STOP violates Article II, Section 4 of the New Mexico Constitution, which provides that "[a]ll persons . . . have certain natural, inherent and inalienable rights, among which are . . . enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and happiness."

Without providing any basis for his assertion, Titus summarily claims that STOP unduly restricts his liberty and property rights. This argument is also insufficiently developed.

**{47}** Titus argues that STOP violates both Article II, Section 14 and Article II, Section 15 of the New Mexico Constitution. However, Titus provides no authority to support either claim and instead relies on his bare assertion that these allegations are true. *See Headley*, 2005-NMCA-045, ¶ 15.

**{48}** Finally, Titus also contends that STOP violates the doctrine of separation of powers as set forth in Article III, Article VI, and Article X of the New Mexico Constitution. Titus relies on one case, *ACLU II* , but fails to explain how this case bears on the issue of separation of powers. This argument, like all of the constitutional claims discussed in this final section, will not be reviewed. *See Headley*, 2005-NMCA-045, ¶ 15 (holding that "[w]e will not review unclear arguments, or guess at what [a party's] arguments might be" and neither will we review arguments that are inadequately developed); *see also ITT Educ. Servs., Inc.*, 1998-NMCA-078, ¶ 10 (this Court will not consider propositions that are unsupported by citation to authority).

## III.   CONCLUSION

**{49}** For the foregoing reasons, we affirm.

**{50}   IT IS SO ORDERED.**

---

**CELIA FOY CASTILLO, Judge**

**I CONCUR:**

---

**JAMES J. WECHSLER, Judge**

**MICHAEL E. VIGIL, Judge (dissenting)**

**VIGIL, Judge (dissenting).**

**{51}** I conclude STOP is outside of the legislative authority granted to Albuquerque and unconstitutional. Since the majority disagrees, I dissent. STOP declares the *act of driving* over the posted speed limit to be a *nuisance*. After the *nuisance of driving* is captured by a camera speed device (CSD), the *owner* of the vehicle is issued a "fine." STOP further declares that *all owners are strictly and vicariously liable for the nuisance*. Thus, STOP makes the mere *owner* of the vehicle absolutely liable for the fine imposed because of

15

another person's *act of driving*. It therefore appears that the purpose of this scheme is to generate revenue income for Albuquerque, and *not* to abate the nuisance of speeding.

## FACTS

{52} An Albuquerque police officer issued Titus a $100 STOP fine after a CSD detected that a vehicle registered to him was exceeding the posted speed limit on October 1, 2006. STOP, Section 7-11-5(B) (stating that a police officer shall cause a STOP fine to be delivered to the registered owner after reviewing the CSD evidence). Titus requested an administrative hearing to contest the STOP fine. At the hearing the City presented no evidence relating to the identity of the driver, and Titus proved by his passport that at the time of the offense, he was out of the country in Germany. When Titus declined to "nominate" who the actual driver was, the Albuquerque hearing officer upheld the $100 STOP fine against Titus because he is the owner of the vehicle.

{53} An Albuquerque police officer issued Titus a second $100 STOP fine when a separate vehicle, which was also registered to Titus, was detected by a CSD exceeding the posted speed limit on August 30, 2007. Titus again requested an administrative hearing. As in the first case, the City presented no evidence who the driver was; Titus again testified he was not in Albuquerque at the day and time of the offense; Titus again declined to "nominate" who the actual driver was; and the Albuquerque hearing officer upheld the second $100 STOP fine against Titus because he is the owner of the vehicle. Titus appealed both administrative decisions to the district court, where the cases were consolidated, and affirmed. Titus appeals.

## DISCUSSION

{54} Albuquerque is a chartered home rule municipality. As such, the City of Albuquerque "may exercise all legislative powers and perform all functions not expressly denied by general law or charter." N.M. Const. art. X, § 6(D). In addition, NMSA 1978, Section 3-17-1 (1993) directs that "The governing body of a municipality may adopt ordinances or resolutions not inconsistent with the laws of New Mexico." We have previously stated that while the inquiry under both provisions is similar, they merit separate treatment. *New Mexicans for Free Enter. v. The City of Santa Fe*, 2006-NMCA-007, ¶ 39, 138 N.M. 785, 126 P.3d 1149. In this case, however, I do not believe that the discussion would materially differ under either consideration. The question before us is whether STOP as adopted is "expressly denied by general law" under the constitutional provision and whether STOP is "inconsistent with the laws of New Mexico" under the statute. I conclude that the STOP ordinance fails on both points.

{55} In its "FINDINGS AND INTENT" the Council

> finds that some *drivers* in Albuquerque *repeatedly violate* posted speed limits. City Council finds that state law against speeding is inadequate to

preserve public safety in Albuquerque. City Council finds that photographic and electronic devices that measure speed are accurate and reliable. City Council finds that implementation of enforcement of speed limits by means of photographic and electronic equipment will abate the *nuisance of speeding*.

(Emphasis added.) STOP, Section 7-11-1(D). It is on the basis of "some drivers" who "repeatedly violate" posted speed limits that speeding is defined as a nuisance. Although STOP's stated intention is to dissuade the act of driving in violation of posted speed limits, STOP nevertheless makes the registered owner "strictly and vicariously liable for the violation." STOP, Section 7-11-5(B). Further, "If there is more than one registered owner, all registered owners shall be jointly and severally liable." *Id.*

**{56}** The Ordinance violates Section 3-18-17. This statute gives municipalities, including chartered home ruled municipalities, the authority to adopt ordinances defining and abating a nuisance. In pertinent part, the statute provides in Subsection (A) that a municipality may by ordinance "define a nuisance, abate a nuisance and impose penalties upon a person who *creates or allows* a nuisance to exist[.]" (Emphasis added.) Thus, the statute clearly limits the right of a city to penalize a person who "creates or allows" the defined nuisance to exist.

**{57}** The imposition of strict and vicarious liability is contrary to the plain, unambiguous meaning of the limitation in Section 3-18-17. STOP imposes strict and vicarious liability, but it does not define these terms. In general, the term "strict liability" is understood to mean a case "when neither care nor negligence, neither good nor bad faith, neither knowledge nor ignorance will save defendant." *Black's Law Dictionary* 1591 (Rev. 4th ed. 1968). Similarly, a general understanding of vicarious liability is that notwithstanding complete innocence, one is held responsible for harm caused by the wrongful act of another. *See Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 399, 827 P.2d 102, 114 (1992). On the other hand, Section 3-18-17(A) limits who may be penalized: "a person who creates or allows a nuisance to exist." The plain meaning of this statutory phrase clearly requires more than mere ownership, without more, of a motor vehicle.

**{58}** The unabridged dictionary in pertinent part defines "create" to mean "to bring about by a course of action or behavior," and it defines "allow" in pertinent part to mean "to permit by way of concession" or "to permit by neglecting to restrain or prevent." *Webster's Third New Int'l Dictionary* 532, 58 (unabridged) (2002). Mere ownership of a motor vehicle does not satisfy the concept of creating or allowing the vehicle to be a nuisance. *Burton's Legal Thesaurus* 134 (3d ed. 1998) describes the concept of "create" as meaning to:

> be responsible, be the agent, be the author, be the cause of, be the reason, beget, bring about, bring into being, bring on, bring out, bring to effect, bring to pass, build, carve, cause, cause to exist, chisel, compose, conceive, concoct, constitute, construct, contribute, contrive, *creare*, develop, devise, effect, engender, engineer, erect, establish, fabricate, fashion, *fingere*, forge,

17

form, formulate, found, frame, generate, give birth to, give origin to, give rise to, ideate, improvise, inaugurate, induce, initiate, institute, invent, kindle, launch, lay the foundations, make, make up, occasion, organize, originate, pattern, procreate, produce, put together, set going, set up, shape, spawn, start, think up[.]

In a similar vein, the same authority describes "allow" as meaning to:

accredit, acknowledge, approve, certify, charter, commission, empower, enable, endorse, enfranchise, entitle, give, give authority, give leave, give permission, grant, grant permission, invest, legalize, legitimatize, license, permit, privilege, qualify, sanction, support, sustain, vouchsafe, warrant[.]

*Burton's Legal Thesaurus*, *supra*, at 27.

**{59}** The concept of strict and vicarious liability is clearly inconsistent with the limitation in Section 3-18-17, that a city is only authorized to penalize a "person who creates or allows a nuisance to exist." Something more than mere ownership is required. The mere owner of a vehicle-even an owner who allows another person to drive the vehicle, without more, is not a person who "creates or allows a nuisance to exist." In this case, contrary to Section 3-18-17, STOP penalizes mere ownership of a vehicle driven by another person over the posted speed limit. Thus, STOP violates Section 3-18-17.

**{60}** The majority repeatedly asserts that Titus did not "pursue" any of the "defenses" recognized by STOP. Majority Opinion ¶ 4. The majority goes so far as to conclude that STOP complies with Section 3-18-17 because "the strict and vicarious liability provision of STOP is limited" in that "Vehicle owners are held strictly and vicariously liable only for those STOP violations for which they are unable or unwilling to prove a defense, or where they are unsuccessful in asserting a defense." Majority Opinion ¶ 27. Thus, "In our view, it is sufficient that Titus is the registered owner of the vehicles that were speeding and proffered no defense." Majority Opinion ¶ 25. These assertions do not withstand scrutiny.

**{61}** First, and foremost, STOP provides on the one hand that at a hearing contesting a STOP fine, "The Department has the burden to prove by a preponderance of the evidence that the violation occurred." STOP, Section 7-11-5(F). On the other hand, in asserting the defenses set forth in STOP, Section 7-11-5(G), the respondent "has the burden of proof" including the defense that "The evidence does not show that a violation was committed involving the subject vehicle." STOP, Section 7-11-5(G)(3). Thus, the City can either assert it has proven the violation or that the respondent owner has failed to prove no offense occurred. Either way, the City wins and the owner loses.

**{62}** An additional "defense," the one primarily relied on by the majority, is that the registered owner was not driving the vehicle at the time of the violation. STOP, Section 7-11-5(G)(4). This defense is asserted by "nominating" who the actual driver of the car was

at the time of the violation. *Id.* However, this is an empty defense. Even if the registered owner makes a proper nomination pursuant to STOP, "[i]f the nominee appeals denying he or she was the driver or defaults [by failing to appear], the city may proceed against the registered owner by issuing a subsequent STOP fine to the registered owner." STOP, Section 7-11-5(D)(3). STOP further specifically provides, "The registered owner is liable for a default by a nominee [for a failure to pay the fine]." STOP, Section 7-11-5(E). Therefore, even if a nominee admits that he or she was driving on the occasion in question, if the nominee does not pay the fine, "The registered owner is liable." Thus, this is really no defense at all, and STOP truly makes the registered owner strictly and vicariously liable for a speeding violation.

{63} STOP not only exceeds and violates the authority granted by Section 3-18-17, it is also inconsistent with two additional statutes. NMSA 1978, Section 66-8-121 (1978) is entitled "Offenses by persons owning or controlling vehicles," and it provides, "It is unlawful for the owner, or any other person, employing or otherwise directing the driver of any vehicle to *require or to permit* the operation of such vehicle upon a highway in any manner contrary to law." (Emphasis added.) The owner of a vehicle only violates the statute if the owner requires or permits the operation of the vehicle in a manner contrary to law. This requires participation or expressly allowing the vehicle to be operated in violation of state law. Secondly, STOP is contrary to Section 30-8-1, which defines a public nuisance. The statute provides, "A public nuisance consists of *knowingly creating, performing or maintaining* anything affecting any number of citizens without lawful authority." (Emphasis added.) Again, this statute requires the actor to "knowingly" create, perform, or maintain the public nuisance. For the reasons I have already pointed out, the imposition of strict and vicarious liability in STOP is inconsistent with these statutes as well.

{64} In addition, the STOP findings do not support holding a registered owner strictly and vicariously liable for a speeding offense where the owner is not the driver or otherwise culpable. In the findings and intent, the Council "declares that a vehicle used to violate this article is the *instrumentality* of a nuisance that must be abated in the city." STOP, Section 7-11-1(E) (emphasis added). Consistent with this finding and intent, STOP defines a "nuisance" as "[t]he *act* of operating a vehicle in violation of this article." STOP, Section 7-11-3 (emphasis added). Thus, STOP itself recognizes that an automobile is not at all times and under all circumstances a nuisance. It is only when it is driven by an operator in violation of the speeding law that it becomes a "nuisance" under STOP. Importantly, Albuquerque itself acknowledges this distinction. In its answer brief, Albuquerque asserts, "Driving and cars are not necessarily nuisances by nature, but become such when the car is an instrumentality driven recklessly through an intersection or, for another example, a school zone." This merely states the obvious.

{65} A nuisance in fact "is usually defined as an activity or structure which is not a nuisance by nature, but which becomes so because of such factors as surroundings, locality, and the manner in which it is conducted or managed." *Vill. of Los Ranchos*, 119 N.M. at 164, 889 P.2d at 199. Thus, under STOP itself, a vehicle only becomes the instrumentality

of a nuisance when it is driven over the posted speed limit. A nuisance per se does not result from the mere ownership of a motor vehicle. *Id.* (stating a nuisance per se is "an activity, or an act, structure, instrument, or occupation which is a nuisance at all times and under any circumstances, regardless of location or surroundings" (internal quotation marks and citation omitted)). Holding the registered owner strictly and vicariously liable for speeding of a particular vehicle regardless of how the owner controlled the instrumentality of the nuisance, is contrary to nuisance jurisprudence.

**{66}** More importantly, holding the owner strictly and vicariously liable for a speeding offense when the owner is not the driver bears no relationship whatsoever to abating the nuisance of speeding. The nuisance is defined in terms of the *act* of speeding and not the vehicle itself. Thus, under the very authorities cited by the majority in ¶ 19, I would invalidate STOP. *See Green*, 46 N.M. at 75, 120 P.2d at 621 (indicating that when it is "plain and palpable that there is no real or substantial relation between the ordinance and its object" the court may set it aside); *Mitchell*, 45 N.M. at 98, 111 P.2d at 44 (indicating that a city regulation may be set aside where it is plain that it "[has] no real relation to the object for which ostensibly [it was] enacted").

**{67}** I agree with the majority that it is appropriate for the City to exercise its governmental power to prohibit, punish, and prevent the *use* of an automobile to speed in violation of posted speed limits, because such *use* of an automobile clearly constitutes a danger to public safety. I could also agree that an owner should be responsible for the speeding if an owner permits or allows another person to drive the automobile, under circumstances where the owner knows or should know that it will be driven over posted speed limits. However, STOP and the majority go beyond these principles, when they equate *ownership* with *use*. In my view, this goes too far.

**{68}** Furthermore, the overall structure of STOP makes it appear to be a scheme for raising revenues rather than to deter speeding. One need look no further than the "nomination" defense so heavily relied on by the majority. The registered owner who was not driving the car at the time of the violation has the option of accepting responsibility or identifying, by nomination, the actual driver. STOP, Section 7-11-5(D)(3). This "defense" is available to any registered owner, including automobile rental businesses, automobile dealerships, and automobile lessors. STOP, Section 7-11-5(D)(3)(a), (b), and (c). As I already pointed out, the owner is responsible for the fine in the event the "nominated" driver either denies driving or does not pay the STOP fine. Thus, individuals who rent automobiles from a car rental company and customers test driving automobiles owned by a dealer can repeatedly commit STOP speeding violations, and STOP does not require the speeder to pay the STOP fine. Instead, STOP makes the car rental company or car dealer responsible for paying each STOP fine, not because they did anything wrong, but simply because they own the vehicle.

**{69}** The majority relies on *Idris* to justify STOP's money making objective. Majority Opinion ¶¶ 23, 25. However, I respectfully submit that *Idris* does not apply because it only addressed whether Chicago's camera system for detecting cars that run red

20

lights and make illegal turns violates the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution. *Idris*, 552 F.3d at 565.

> The [United States] Constitution does not demand that units of state government follow state law. A federal court assumes that the action is authorized as a matter of local law and asks only whether federal law forbids what the city or state has done. Whether state law permits that action in the first place is a question for state courts, under their own law.

*Idris*, 552 F.3d at 567 (citations omitted). In this case, however, we are presented with whether STOP violates New Mexico law in the first instance. *Idris* does not apply. Finally, I do not discuss the portion of STOP in which a STOP fine is issued after a CSD records a red light violation because that part of the ordinance is not before us in this case.

**CONCLUSION**

**{70}** By penalizing a person or entity which does nothing except merely own a vehicle which is driven by another person over the posted speed limit, STOP is contrary to New Mexico law and unconstitutional. Since the majority disagrees, I dissent.

---

        **MICHAEL E. VIGIL, Judge**

**Topic Index for *Titus v. City of Albuquerque*, Docket No. 29,461**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| CT-NM | New Mexico Constitution, General |
| CT-VO | Vague or Overbroad |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-MH | Motor Vehicle Violations |
| CL-NU | Nuisances |
| CL-SR | Strict Liability |
| | |
| **GV** | **GOVERNMENT** |
| GV-MU | Municipalities |
| GV-OR | Ordinances |