**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date:  **JUNE 20, 2016**

**NOS. 33,280 & 33,279 (Consolidated)**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**STEVEN MAXWELL,**

      Defendant-Appellant,

and

**MICHAEL MAXWELL,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Mary L. Marlowe Sommer, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Tonya Noonan Herring, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellants

**OPINION**

**ZAMORA, Judge.**

{1}     In this consolidated appeal, Defendants Michael and Steven Maxwell were convicted of four counts each of fraud, contrary to NMSA 1978, Section 30-16-6 (2006); three counts each of securities fraud, contrary to NMSA 1978, Section 58-13B-30 (1986) (repealed 2009); and three counts each of transacting business as a broker-dealer without a license, contrary to NMSA 1978, Section 58-13B-3 (1986) (repealed 2009), under the New Mexico Securities Act of 1986, NMSA 1978, §§ 58-13B-1 to -57 (1986, as amended through 2004) (repealed 2009). Defendants challenge their convictions under the Securities Act, claiming that the convictions violate the prohibition against double jeopardy. Defendants also challenge several evidentiary rulings by the district court and argue that the evidence was insufficient to support their convictions. We affirm in part and reverse in part.

**I.     BACKGROUND**

{2}     Michael Maxwell met Robert and Carol Duncan (the Duncans) in 2006 when he began dating their granddaughter, Brianna Rotterdam. Brianna and Michael lived with the Duncans for a period of time while the two were saving up to purchase a home. Michael and his brother, Steven Maxwell (together Defendants, individually,

Michael and Steven), discussed investment and business opportunities with the Duncans, and the four decided to do business together.

{3} In October 2007, the Duncans and Defendants signed articles of incorporation for an investment corporation named Ox Development, Inc. (Ox Development). The articles of incorporation reflect that the Duncans each contributed $135,000, and each was to have a 2.5 percent ownership interest in the company. Defendants were each supposed to contribute $600,000, and each would have a 47.5 percent ownership interest in the company. On October 26, 2007, Defendants helped the Duncans obtain a home equity loan on their house in the amount of $300,000. From the $300,000 loan, $30,000 went to interest on the loan. The Duncans understood that the remaining $270,000, which represented their combined contribution to Ox Development, would be saved for a real estate investment project in Santa Barbara, California.

{4} On five occasions between August 15, 2007 and May 9, 2008, the Duncans transferred funds to Defendants for investment purposes. According to the Duncans, each transfer was designated for a specific investment purpose. In total, Defendants received approximately $443,000 from the Duncans.

{5} By the end of May 2008 only $484.33 of the $448,558 transferred by the Duncans remained, and none of the investments or business opportunities presented

to the Duncans had been realized. The Duncans became suspicious and reported to the Santa Fe County Sheriff's Office that they had been the victims of fraud. After an investigation, Defendants were indicted on five counts of fraud, three counts of securities fraud, three counts of transacting business as a broker-dealer without a license, two counts of selling or offering to sell unregistered securities, two counts of money laundering, one count of forgery, one count of racketeering, and one count of conspiracy to commit racketeering.

{6}     Defendants' cases were consolidated prior to trial. At trial, a forensic accountant testified in detail about how the funds received from the Duncans were disbursed. The $448,558 was deposited into Defendants' own business accounts and was disbursed to Defendants in the form of checks or electronic transfers; taken out in cash withdrawals; used to pay some of Defendants' debt, rent, phone and utility bills; and spent on miscellaneous purchases including travel expenses, medical bills and purchases at stores including Dillard's, Wal-Mart, Smith's, gas stations, and convenience stores.

{7}     Defendants testified that their plan was to start a development business with the Duncans and to pursue a number of investment opportunities. Defendants denied that each of the five sums of money they received from the Duncans was designated for one specific project. According to Defendants, they used the Duncans' investment

3

to develop the company and to pursue various investment deals. Defendants testified that the Duncans understood that they would be funding the development of the business. However, Ox Development, the joint venture between Defendants and the Duncans, was never funded. Instead, the Duncans' money was deposited into accounts owned solely by Defendants, and was not carefully managed or accounted for.

{8}     The defense presented some evidence that a portion of the money was used toward investment projects with the Duncans. Michael testified that some of the money was used to purchase land in Edgewood, New Mexico, and some was used to pay a contractor who was going to begin building houses on that property. Defendants also testified that $100,000 was used to purchase e-trade accounts. However, the e-trade accounts were in Defendants' names. The rest of the money was used for developing/maintaining Defendants' business and in the pursuit of investment opportunities and business deals. Defendants were both convicted of four counts of fraud, three counts of securities fraud, and three counts of transacting business as a broker-dealer without a license. This appeal followed.

## II.     DISCUSSION

### A.     Evidentiary Issues

4

{9} Defendants claim that the district court erred by preventing Michael from giving testimony that would have explained his conduct and intent and from giving testimony to impeach Mr. Duncan. Defendants also argue that the district court improperly admitted propensity evidence. "We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted).

**1.    Exclusion of Testimony—Hearsay**

{10} Defendants argue that the district court erred in prohibiting Michael from testifying regarding certain financial statements created by Michael showing payments made by Defendants to Mr. Duncan and introduced into evidence by the State. Defendants contend that Michael's intended testimony, that he prepared the statements at the Duncans' request, would have impeached Mr. Duncan's prior testimony that he did not know why Michael prepared the statements. The district

5

court determined that the excluded testimony was hearsay because the testimony was being offered for the truth of the matter asserted.

{11}     Rule 11-801(C) NMRA defines "hearsay" as "a statement that . . . the declarant does not make while testifying at the current trial or hearing, and . . . a party offers in evidence to prove the truth of the matter asserted in the statement." In this case, Michael attempted to testify that he prepared account statements at Mr. Duncan's request. The purposes behind the testimony were purportedly to establish why Michael prepared the statements and to impeach Mr. Duncan's testimony that he did not know why Michael prepared the statements. Defendants do not explain how Michael's reason for preparing the statements is relevant except as impeachment evidence offered to undermine Mr. Duncan's veracity—in other words, Michael did not seek to offer the testimony to prove that Mr. Duncan requested the statements, but rather to prove that he was not truthful in his testimony.

{12}     Although Defendants' argument is that the testimony was *not* offered for the truth of the matter asserted, the district court understood the testimony as *being* offered for the truth of the matter asserted by the statement—i.e., that it was offered to prove that Mr. Duncan had, in fact, requested the statements or a verbal act. *See State v. Ruiz*, 2007-NMCA-014, ¶ 36, 141 N.M. 53, 150 P.3d 1003 ("[A] statement offered merely to prove that it was made, and not to prove truth, is characterized as

a verbal act that is admissible irrespective of any limitations on hearsay testimony." (internal quotation marks omitted)). The district court's interpretation, that the testimony was being offered for the truth of the matter asserted does not appear to be unreasonable, untenable, or unjustified by reasons. Therefore, we conclude that it did not abuse its discretion. *See Rojo*, 1999-NMSC-001, ¶ 41; *cf. State v. Ramirez*, 1976-NMCA-101, ¶ 40, 89 N.M. 635, 556 P.2d 43 ("The [district] court is still the best judge whether evidence tendered as a public record or compiled in regular course meets the standard of trustworthiness and reliability[,] which will entitle the record to stand as evidence of issuable facts."), *holding limited on other grounds as stated in Sells v. State*, 1982-NMSC-125, ¶ 9, 98 N.M. 786, 653 P.2d 162.

{13} We believe the district court's explanation of its reasons for excluding the testimony "show[s] that it exercised its discretion and reached a result a judge reasonably might reach on the arguments and evidence. That is all we require to sustain a discretionary determination." *State v. Johnson*, 1997-NMSC-036, ¶ 40, 123 N.M. 640, 944 P.2d 869. We conclude that the district court did not abuse its discretion in excluding Michael's testimony as hearsay.

{14} Moreover, whether the statement was offered for the truth of the matter asserted or not, Defendants fail to explain how Mr. Duncan's recollection of whether he requested the account statements was relevant or would have impacted anything

7

in the case. Even if the statement was non-hearsay, and even if Defendants had been able to prove that Mr. Duncan requested the account statement, and his prior testimony that he did not know why the statement was provided was incorrect, such a purported gap in Mr. Duncan's memory is not relevant to any element of any of the charges against Defendants. Defendants argue that the reason for Michael's proposed testimony was to show why he had prepared the statements. The reason behind the production of the account statement is also not relevant to any element of any of the charges brought against the Defendants. *See* Rule 11-401 NMRA ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]").

{15}     Defendants claim that the trial was a credibility contest between them and the Duncans.  As a result, their case was adversely impacted by the absence of Michael's testimony and therefore were prejudiced by this exclusion. We disagree. Any conflicting testimony is to be resolved by the fact-finder, and the fact-finder is free to reject the defendant's version of events. *See State v. Foxen*, 2001-NMCA-061, ¶ 17, 130 N.M. 670, 29 P.3d 1071. "Error in the exclusion of evidence in a criminal trial is prejudicial and not harmless if there is a reasonable possibility that the excluded evidence might have affected the jury's verdict." *State v. Balderama*, 2004-NMSC-008, ¶ 41, 135 N.M. 329, 88 P.3d 845. Defendants are unable to show that

8

Michael's testimony was important and critical to the case. *See Mathis v. State*, 1991-NMSC-091, ¶ 14, 112 N.M. 744, 819 P.2d 1302 (holding that "the focus in determining prejudice is on whether the missing evidence is important and critical to the case"). As discussed later, there was sufficient evidence to show that Defendants intentionally misrepresented to the Duncans what they were doing with the Duncans' money. There is nothing in the record to convince us there is a reasonable possibility the district court's exclusion of Michael's testimony would have contributed to Defendants' convictions. We hold that Defendants were not prejudiced by the exclusion of Michael's testimony.

{16}    As such, the district court's exclusion of the testimony would be, at most, harmless error. *See State v. Tollardo*, 2012-NMSC-008, ¶¶ 25-27, 43-44, 57, 275 P.3d 110 (explaining harmless error and stating that "[i]mproperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful"). Accordingly, we conclude that the district court did not abuse its discretion in excluding Michael's testimony concerning the account statements. *See Sarracino*, 1998-NMSC-022, ¶ 20.

{17}    Defendants also argue that the district court erred in prohibiting Michael from testifying regarding his reasoning behind keeping a certain payment secret. Defendants assert that Michael intended to testify that Mrs. Duncan requested that Michael make a $10,000 payment to her daughter without informing Mr. Duncan of

the payment, in order to explain why Michael did not inform Mr. Duncan of the payment. The State objected to the testimony as hearsay, which the district court sustained.

{18}     On appeal, Defendants contend that Mrs. Duncan's statement was not hearsay because the purported purpose of the testimony was to establish why Michael agreed not to tell Mr. Duncan about the secret payment. However, the proposed testimony explaining that Mrs. Duncan asked Defendant not to tell Mr. Duncan about the payment, offered to explain Michael's conduct and intent in disposing of the money without telling Mr. Duncan appears to have been offered for the truth of the matter asserted in the statement. *See* Rule 11-801(C). By Defendants' own argument, Michael was attempting to show why a payment was kept secret by introducing a statement explaining why the payment was kept secret. Defendants have not provided any explanation as to how such a statement was not offered for the truth of the matter asserted. As such, we conclude that the district court did not err in excluding the testimony as hearsay. *See id.*; *Sarracino*, 1998-NMSC-022, ¶ 20.

{19}     Again, Defendants claim that because the credibility of the witnesses was an issue, Michael's testimony was required to show the inconsistency in Mrs. Duncan's testimony. Any credibility determinations are best left to the fact-finder. *See Foxen*, 2001-NMCA-061, ¶ 17. Defendants are unable to show how Michael's testimony

about the $10,000 was important and critical to the case or that there was a reasonable possibility that its exclusion would have contributed to their convictions. *See Mathis*, 1991-NMSC-091, ¶ 14; *see also Balderama*, 2004-NMSC-008, ¶ 41. Again as discussed later, there was sufficient evidence to show that Defendants intentionally misrepresented to the Duncans what they were doing with the Duncans' money. We hold that Defendants were not prejudiced by the exclusion of Michael's testimony and the district court's exclusion of this testimony is harmless error. *See Tollardo*, 2012-NMSC-008, ¶¶ 25-27. Accordingly, we conclude that the district court did not abuse its discretion in excluding Michael's testimony concerning the $10,000 payment.

**2.      Admission of Testimony—Prejudicial Effect Versus Probative Value**

{20}      Defendants argue that the district court erred in allowing the State's witness, Lorie McLain, to testify about her prior business dealings with Michael because the prejudicial effect of her testimony outweighed the probative value. Again, the appellate courts "review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *Sarracino*, 1998-NMSC-022, ¶ 20. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly

11

untenable or not justified by reason." *Rojo*, 1999-NMSC-001, ¶ 41 (internal quotation marks and citation omitted).

{21}    Mr. Duncan testified that Defendants approached him about purchasing some land that was owned by Defendants' parents. Mr. Duncan agreed to fund the purchase of the property. Defendants were going to build houses on the property and they would share the profits. On August 15, 2007, Mr. Duncan gave Defendants $78,950 to purchase the investment property. Ms. Anne Layne, the State's forensic accounting expert testified that the $78,950 was used to open a new bank account in Defendants' names, and $17,500 was paid from that account to Ms. McLain. Ms. McLain then testified that she gave Michael $17,500 to help her acquire real estate, which he did not do, and that she was eventually able to get Michael to return the money to her.

{22}    Defendants assert that the fact that money was transferred to Ms. McLain was already in evidence by the State's forensic accountant and that Ms. McLain's testimony only served to explain the background behind why Defendants transferred money to her. Therefore, Defendants argue the prejudicial impact of the evidence of Ms. McLain's failed business deal with Defendants outweighs the probative value of understanding why the Duncans' money was transferred to a third party rather than being invested.

{23} Rule 11-403 NMRA states that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, the probative value of the information provided by Ms. McLain was in providing an explanation as to how Defendants' transfer of the Duncans' funds to Ms. McLain was, in fact, fraudulent, because part of the funds were used to repay an unrelated, prior debt and were not invested as expected by the Duncans. Defendants have failed to show how such testimony introduced a danger of "unfair prejudice, confus[ion of] the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* In particular, Defendants have not shown that the fact of the transfer to Ms. McLain to repay a prior debt confused any issues, misled the jury in any respect, created any undue delay, wasted any time, or needlessly presented cumulative evidence. "The purpose of Rule 11-403 is not to guard against any prejudice whatsoever, but only against the danger of *unfair* prejudice." *State v. Otto*, 2007-NMSC-012, ¶ 16, 141 N.M. 443, 157 P.3d 8 (alteration, internal quotation marks, and citation omitted). "Evidence is not unfairly prejudicial simply because it inculpates the defendant. Rather, prejudice is considered unfair when it goes only to character or propensity." *Id.* (emphasis, internal quotation marks, and citations omitted).

{24} To the extent Defendants are arguing that the testimony is unfairly prejudicial because the purported prior bad act showed conformity with an infirm character trait in violation of Rule 11-404(A)(1) NMRA, this argument is unavailing. There is a two-step process in determining whether there is an exception to the general rule of exclusion of character or propensity evidence. *See State v. Jones*, 1995-NMCA-073, ¶ 5, 120 N.M. 185, 899 P.2d 1139. The first step is "an articulation or identification of the consequential fact to which the proffered evidence of other acts is directed[,]" and the second step involves balancing the probative value of the evidence and its prejudicial value. *Id.*

{25} Here, Ms. McLain's testimony provides an explanation regarding the expenditure of the Duncans' $78,950 investment in a manner that was not in alignment with the intended purpose. While Ms. McLain's testimony could show conformity with an infirm character trait, the testimony was not offered for that purpose. *See* Rule 11-404(A)(1), (B)(1). Rather, the testimony was offered to show how the Duncans' funds were used for a non-approved purpose—i.e., to show opportunity, plan, knowledge, or one of the other permitted uses set forth in Rule 11-404(B)(2). *See State v. Maples*, 2013-NMCA-052, ¶ 22, 300 P.3d 749 ("Behavior or acts are often behind descriptions of character, but describing acts is not the same thing as giving character evidence. In such circumstance, close attention to relevance

14

may help resolve any potential problems." (alterations, omission, internal quotation marks, and citation omitted)); *cf. State v. Mercer*, 2005-NMCA-023, ¶ 7, 137 N.M. 36, 106 P.3d 1283 (reiterating that, in a prosecution for fraud, the state could introduce evidence of other instances of uncharged misconduct involving similar actions as relevant to the defendant's motive or intent to defraud). As to the second step, although the testimony may also show conformity with an infirm character trait, the potential for such a conclusion and the potential impact of such a conclusion is outweighed by the probative value that the explanation of the unapproved expenditure provides. *See* Rule 11-403.

{26} We conclude that Defendants have failed to show how Ms. McLain's testimony unfairly prejudiced Defendants' case, so as to rise to the level of substantially outweighing the probative value of the testimony. *See id.* Accordingly, we conclude that the district court did not abuse its discretion in admitting the testimony. *See Rojo*, 1999-NMSC-001, ¶ 48.

**B.     Prosecutorial Misconduct**

{27} Defendants argue that the prosecutor engaged in misconduct by improperly eliciting propensity evidence from Ms. McLain and Brianna, and then referencing the propensity evidence in his closing argument. Defendants acknowledge that this argument was not preserved. Where an issue was not preserved at the district court

level, this Court may nonetheless review for fundamental error or plain error. *See* Rule 12-216(B)(2) NMRA; Rule 11-103(D) NMRA. "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Dartez*,1998-NMCA-009, ¶ 21, 124 N.M. 455, 952 P.2d 450 (internal quotation marks and citation omitted). "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *State v. Trujillo*, 2002-NMSC-005, ¶ 52, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted). "The rule of plain error applies to errors that affect substantial rights of the accused[.]" *Dartez*,1998-NMCA-009, ¶ 21. "Whether this Court reviews for fundamental error or plain error, it must be convinced that [the error] constituted an injustice that creates grave doubts concerning the validity of the verdict." *Id.* ¶ 22 (internal quotation marks and citation omitted).

{28}    As we previously discussed, Ms. McLain's testimony was not improperly offered as propensity evidence. Thus, we cannot conclude that the prosecutor engaged in misconduct by eliciting the testimony. With regard to Brianna's testimony, Defendants argue that the prosecutor engaged in misconduct when he asked Brianna

about a statement she made in a prior interview. The statement was made during an interview Brianna gave as part of the investigation into Defendants' business dealings with the Duncans. On cross examination, the prosecutor asked Brianna if she remembered being asked what Michael did for a living, and answering, "screw people." The question was asked as part of a line of questioning concerning several statements Brianna made during the interview. Defense counsel objected to Brianna's statements being read into the record without a sufficient foundation. The district court sustained the objection, on the grounds that the prosecutor was not impeaching the witness properly. The prosecutor adjusted the manner in which he asked Brianna about her statements during the interview. There were no further objections to the line of questioning.

{29}     To the extent that Defendants argue that Brianna's testimony was admitted as improper character or propensity evidence, we are not persuaded. Defendants did not object to Brianna's statement on propensity grounds during the trial. Moreover, the State argues, and Defendants appear to concede that the prosecutor did not offer the statement as propensity evidence, but rather, to impeach Brianna who initially told investigators that Michael was in the business of "screw[ing] people" and then testified on his behalf at the trial. Offered for impeachment purposes, Brianna's testimony would not have been improper propensity evidence. *See State v. Lopez*,

17

2011-NMSC-035, ¶ 15, 150 N.M. 179, 258 P.3d 458 ("When impeaching with prior inconsistent statements not made under oath, it is the fact of the inconsistency that is admissible, not the substantive truth or falsity of the prior statement." (internal quotation marks and citation omitted)). And we cannot say that the prejudicial impact of such evidence outweighs its probative value as evidence that goes to Brianna's truthfulness or veracity.

{30} Defendants also contend that the prosecutor improperly referenced Brianna's statement during his closing argument by characterizing what happened with the Duncans as just another "screw job." Based on our review of the record, the prosecutor appropriately recounted to the jury the provisions of the Articles of Incorporation for Ox Development, referencing the disparity between the $270,000 contributed by the Duncans collectively, for a 5 percent interest, as opposed to the amount contributed by Defendants, which was supposed to be $1.2 million collectively but turned out to be zero dollars, for 95 percent interest in the company. The prosecutor argued, "to use the words of Brianna Rotterdam," the deal on its face was a "screw job." Accordingly, we conclude that no error occurred.

**C.  Cumulative Error**

{31} Defendants argue that the exclusion of explanatory and impeachment evidence, the admission of prejudicial propensity evidence, and prosecutorial misconduct

constituted cumulative error that deprived them of a fair trial. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. Cumulative error "requires reversal of a defendant's conviction when the cumulative impact of errors[,] which occurred at trial was so prejudicial that the defendant was deprived of a fair trial. This doctrine is to be strictly applied, and . . . cannot [be] invoke[d] if the record as a whole demonstrates that [the defendant] received a fair trial." *State v. Woodward*, 1995-NMSC-074, ¶ 59, 121 N.M. 1, 908 P.2d 231 (internal quotation marks and citation omitted), *abrogated by State v. Montoya*, 2014-NMSC-032, ¶ 15, 333 P.3d 935. Since the district court's evidentiary rulings were made within its sound discretion, we conclude that there is no cumulative error requiring reversal. *See State v. Smith*, 2016-NMSC-007, ¶ 72, 367 P.3d 420.

**D. Sufficiency of the Evidence**

**1. Standard of Review**

{32} Defendants claim that the State presented insufficient evidence to support their convictions. "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences

19

and resolving all conflicts in the evidence in favor of the verdict." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted). "In that light, the Court determines whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). We do not "weigh the evidence and may not substitute [our] judgment for that of the fact[-]finder so long as there is sufficient evidence to support the verdict." *State v. Griffin*, 1993-NMSC-071, ¶ 17, 116 N.M. 689, 866 P.2d 1156 (internal quotation marks and citation omitted).

**2.    Jury Instructions**

{33}    Following are the jury instructions that were given, which guide our analysis except for the elements containing the dates, which we discuss in our analysis.

**a.    Fraud—Counts 1, 5, 8, and 9**

{34}    In order to find Defendants guilty of fraud in Counts 1, 5, and 8, the jury had to find that in the relevant time frame for each of the counts, Defendants, by any words and conduct, misrepresented a fact to the Duncans, intending to deceive or cheat them; because of the Duncans' reliance on Defendants' misrepresentations, Defendants obtained over $20,000; that the money belonged to someone other than Defendants; and that the money had a market value of over $20,000.

{35}     In order to find Defendants guilty of fraud in Count 9 the jury had to find that, on May 9, 2008, Defendants, by any words and conduct, misrepresented a fact to the Duncans, intending to deceive or cheat them; that because of the Duncans' reliance on Defendants' misrepresentations, Defendants obtained over $2,500; that the money belonged to someone other than Defendants; and that the money had a market value of over $2,500.

**b.     Securities Fraud—Counts 3, 6, 10**

{36}     In order to find Defendants guilty of securities fraud as charged in Counts 3, 6, and 10, the jury had to find that in the relevant time frame for each of the counts, Defendants sold or offered to sell a security and that in connection with the offer or sale of the security, Defendants purposefully and directly or indirectly used a plan or scheme to deceive or cheat others.

**c.     Transacting Business as a Broker-Dealer Without a License—Counts 4, 7, and 11**

{37}     In order to find Defendants guilty of transacting business as a broker-dealer without a license, as charged in Counts 4, 7, and 11, the jury had to find that for the relevant time frame for each count, Defendants engaged in the business of effecting transactions in securities for the account of others, and that while doing so, Defendants were not licensed.

21

**d.    Definitions**

{38}    The jury was given the following definitions:

> A 'security' is any ownership right or right to an ownership position and includes any stock, interest in a limited liability company, investment contract, participation in any profit-sharing agreement, evidence of indebtedness and any interest or instrument commonly known as a security.

> 'Stock' is the ownership of a corporation represented by shares that are a claim on the corporation's earnings and assets.

> A 'limited liability company' or 'LLC' is an organization formed pursuant to the provisions of the New Mexico Limited Liability Company Act.

> An 'investment contract' means a contract: [(1) w]here an individual invests his money; [(2) i]n an undertaking or venture of two or more people or entities; [(3) w]ith an expectation of profit; [and (4) b]ased primarily on the efforts of others.

**3.    The Evidence at Trial**

**a.    Transaction One**

{39}    Mr. Duncan testified that he had an agreement with Defendants regarding some investment property in Edgewood, New Mexico. Mr. Duncan agreed to purchase the land and Defendants agreed to have houses built on the land, and once the houses sold, Defendants and the Duncans would split the profits. Mr. Duncan testified that Defendants, together, presented this investment opportunity to him. Mrs. Duncan testified that Michael took the Duncans to see model homes that he wanted to build

22

on the Edgewood land. On August 15, 2007, Defendants accompanied Mr. Duncan to Wells Fargo bank where he withdrew $78,950 in the form of a cashier's check.

{40}     Anne Layne, the State's forensic accounting expert testified that the same day, Defendants used the cashier's check to open a new bank account in their names. The money in that account was disbursed as follows: $38,100 to Michael in the form of checks or electronic transfers; $17,500 to Lorie McLain; $10,000 in cash withdrawals; $9,650 to Steven in checks or electronic transfers; $2,712 in checks to apartment complexes for rent; $963 to various telephone companies; and $110 in bank fees. According to Ms. Layne, by the end of September 2007 the account contained $1,024.49. Between September 2007 and October 2009 when the account was closed, the account contained approximately $1,000. The Duncans never received the title to the land, and the project was never completed.

{41}     In connection with this transaction, Defendants were charged and convicted of one count of fraud (Count 1). Based on the evidence presented, we conclude that a reasonable jury could conclude that between July 1, 2007 and August 15, 2007, by their words or actions, Defendants misrepresented facts to the Duncans, intending to deceive or cheat them, and that because of the Duncans' reliance on Defendants' misrepresentations, Defendants obtained more than $20,000.

**b.      Transaction Two**

{42}     In October 2007, the Duncans and Defendants signed the articles of incorporation for an investment corporation named "Ox Development, Inc." The articles of incorporation reflect that the Duncans each contributed $135,000, and each was to have a 2.5 percent ownership interest in the company. Defendants were each supposed to contribute $600,000, and each would have a 47.5 percent ownership interest in the company. On October 26, 2007, Defendants helped the Duncans obtain a home equity loan on their house in the amount of $300,000. From the $300,000 loan, $30,000 went to interest on the loan. The Duncans understood that the remaining $270,000 would be used for a real estate investment project in Santa Barbara, California.

{43}     The Duncans both testified that Defendants said they had control over some condominiums in Santa Barbara. Mr. Duncan testified that the plan was for the Duncans to partner with Defendants to demolish the existing structures and build new condominiums on the property. Mrs. Duncan testified that Defendants reviewed information with her and Mr. Duncan concerning the demographics and the housing market in Santa Barbara. According to Mrs. Duncan, Defendants were going to use the $270,000 for obtaining permits and licenses necessary to get the Santa Barbara deal going. Mrs. Duncan testified that Defendants told her and her husband that they

24

could expect to make approximately $500,000 in profits after the condominiums were sold.

{44} On October 29, 2007, the Duncans transferred $270,000 to Defendants. However, Ox Development was never funded. The funds were deposited into an account owned solely by Defendants, and were not carefully managed or accounted for. Approximately five weeks later the account was closed with a zero balance. The funds from the account had been distributed as follows: $120,000 to Michael in the form of checks or electronic transfers; $109,000 to Steven in checks or electronic transfers; $59,178 in cash withdrawals; $30,000 to Leyba Construction; $11,042 in miscellaneous purchases from stores including Dillard's, Wal-Mart, Smith's, gas stations and convenience stores; and $1,000 to East Mountain Realty. The $270,000 was not invested in the Santa Barbara real estate project and the condominiums were never built.

{45} In connection with this transaction, Defendants were convicted of one count of securities fraud (Count 3), one count of transacting business as a broker-dealer without a license (Count 4), and one count of fraud (Count 5). As to Count 3, we conclude that a reasonable jury, based on the evidence presented, could find that between October 29, 2007 and July 1, 2008, Defendants sold or offered to sell a security and that in connection with the offer or sale of the security, Defendants

purposefully used a plan or scheme to deceive or cheat the Duncans. As to Count 4, we conclude that a reasonable jury could find that between October 29, 2007 and July 1, 2008, Defendants engaged in the business of effecting transactions in securities for the account of others and that while doing so, Defendants were not licensed to do so. As to Count 5, we conclude that a reasonable jury could find that between September 15, 2007 and October 29, 2007, Defendants, by their words or actions, misrepresented facts to the Duncans, intending to deceive or cheat them, and that because of the Duncans' reliance on Defendants' misrepresentations, Defendants obtained more than $20,000.

**c.     Transaction Three**

{46}     Mr. Duncan testified that Michael convinced him that he could earn a greater return on his money if it were taken out of his savings account and invested in commodities. On January 18, 2008, Michael accompanied Mr. Duncan to the bank where Mr. Duncan withdrew all of the money in his savings account, totaling $50,257.81. The same day, $50,257.81 was deposited into an account in the name of Ox Investments, LLC (Ox Investments). Ox Investments, as opposed to Ox Development, which the Duncans purportedly invested in, was a company controlled solely by Defendants and Defendants were the only signers on that account. The account had been opened on January 16, 2008, with a one hundred dollar deposit.

{47} The money in the account was disbursed as follows: $8,000 to Michael in the form of checks or electronic transfers; $7,500 to a company called Green Lake Capital; $5,700 to Defendants' bookkeeper; $4,885 to Steven in the form of checks or electronic transfers; $4,744 in cash withdrawals; $4,351 to various telephone companies; $4,150 to Mr. Duncan; $3,221 spent at Wal-Mart; $2,971 spent at furniture stores; $2,892 for travel expenses including airfare, rental cars, and hotels; and $1,844 in miscellaneous purchases including grocery stores, gas stations, and convenience stores. Though Defendants paid the Duncans $5,850 and called it "dividends," there was no evidence that any of the $50,257.81 was invested in commodities.

{48} In connection with this transaction, Defendants were convicted of one count of securities fraud (Count 6), one count of transacting business as a broker-dealer without a license (Count 7), and one count of fraud (Count 8). As to Count 6, we conclude that a reasonable jury, based on the evidence presented, could find that between October 29, 2007 and July 1, 2008, Michael sold or offered to sell a security and that in connection with the offer or sale of the security, Michael purposefully used a plan or scheme to deceive or cheat the Duncans. As to Count 4, we conclude that a reasonable jury could find that between October 29, 2007 and July 1, 2008, Michael engaged in the business of effecting transactions in securities for the account

of others and that while doing so, Michael was not licensed to do so. As to Count 5, we conclude that a reasonable jury could find that between September 15, 2007 and October 29, 2007, Michael, by words or actions, misrepresented facts to the Duncans, intending to deceive or cheat them, and that because of the Duncans' reliance on Michael's misrepresentations, Defendants obtained more than $20,000.

{49}  However, we cannot say that the evidence presented, that Steven was a signer on the account into which the $50,257.81 was deposited and that Steven received $4,885 from the deposited funds, is sufficient to support a finding that Steven sold or offered to sell a security (Count 6); engaged in the business of effecting transactions in securities without a license (Count 7); or that Steven misrepresented facts to the Duncans, intending to deceive or cheat them (Count 8). As a result, we conclude that the evidence presented concerning the third transaction is not sufficient to support Steven's convictions on Counts 6, 7, and 8.

**d.    Transaction Four**

{50}  Mr. Duncan testified that Michael told him that if he agreed to loan Maloney's Tavern in Albuquerque, New Mexico $20,000, he would make $10,000 in interest in thirty days. On March 10, 2008, Mr. Duncan gave Michael a $20,000 cashier's check payable to Ox Investments. The cashier's check, signed by Steven, was deposited into Ox Investments' bank account and was distributed as follows: $2,459 covered the

28

amount by which the account was overdrawn; $5,588 in cash withdrawals; $4,000 to legal representatives; $1,909 in miscellaneous purchases; $1,700 to Mr. Duncan; $1,643 to telephone companies; $1,500 to Steven; and $1,200 to Michael. There is no evidence that the $20,000 transferred to Defendants on March 10, 2008, was loaned to Maloney's Tavern. Mr. Duncan did not receive any money back from Defendants in connection with this transaction.

{51} In connection with this transaction, Defendants were convicted of one count of fraud (Count 9). We conclude that a reasonable jury could find that on March 10, 2008, Michael, by words or actions, misrepresented facts to Mr. Duncan; intending to deceive or cheat him, and that because of Mr. Duncan's reliance on Michael's misrepresentations, Defendants obtained more than $2,500.

{52} Based on the evidence presented, Michael was the one that had direct contact with Mr. Duncan with regard to this transaction. The evidence presented that Steven was a signer on the account into which the $20,000 was deposited, that Steven himself indorsed the $20,000 check, and that Steven received $1,500 from the deposited funds, is insufficient to support a finding that Steven misrepresented facts to Mr. Duncan, intending to deceive or cheat him. As a result, we conclude that the evidence presented concerning the fourth transaction is not sufficient to support Steven's conviction on Count 9.

29

**e.  Transaction Five**

{53}     Mrs. Duncan testified that she discussed her granddaughter's trust account with Michael and that Michael convinced her she could get a better return on the money if she allowed him to invest it for her. On May 9, 2008, Mrs. Duncan withdrew $19,351 out of her granddaughter's trust account. The money was deposited into the Ox Investments account. As noted earlier, when the $19,351 was deposited, the Ox Investments account was overdrawn by $83.47. The remainder of the deposit was disbursed as follows: $5,979 transferred to other accounts; $3,500 to Michael; $3,000 to Steven; $2,206 spent on miscellaneous purchases; $1,907 for medical expenses; $1,174 for utilities; $866 to telephone companies; and $718 for travel expenses. Ms. Duncan was not repaid any funds in connection with this transaction.

{54}     In connection with this transaction, Defendants were convicted of one count of securities fraud (Count 10), and one count of transacting business as a broker-dealer without a license (Count 11). As to Count 10, we conclude that a reasonable jury could find that on or about May 9, 2008, Michael sold or offered to sell a security, and that in connection with the offer or sale of the security, Michael purposefully used a plan or scheme to deceive or cheat Mrs. Duncan. As to Count 10, we conclude that a reasonable jury could find that on or about May 9, 2008, Michael

30

engaged in the business of effecting transactions in securities for the account of others and that while doing so Michael was not licensed.

{55}    Again, we cannot conclude that the evidence that the $19,350 was deposited into the Ox Investments account on which Steven was a signer, and that Steven received $3,000 from the deposited funds, is sufficient to support a finding that Steven sold or offered to sell a security to Mrs. Duncan (Count 10), or that Steven engaged in the business of effecting transactions in securities without a license (Count 11). As a result, we conclude that the evidence presented concerning the fifth transaction is not sufficient to support Steven's convictions on Counts 10 and 11.

{56}    To the extent that Defendants contend that their own testimony and the testimony of others could have supported a different result, "[t]he question is not whether substantial evidence would have supported an opposite result but whether such evidence supports the result reached." *State v. James*, 1989-NMCA-089, ¶ 11, 109 N.M. 278, 784 P.2d 1021; *see Griffin*, 1993-NMSC-071, ¶ 17 (stating that a reviewing court does not "weigh the evidence and may not substitute its judgment for that of the fact[-]finder so long as there is sufficient evidence to support the verdict." (internal quotation marks and citation omitted)).

## E.    Double Jeopardy

{57}    Defendants argue that multiple convictions of securities fraud and transacting business as a broker-dealer without a license, violates the prohibition against double jeopardy. Defendants assert that Sections 58-13B-3 and -30 were not intended to punish what Defendants claim was a single course of conduct. A double jeopardy challenge is a constitutional "question of law, which we review de novo." *State v. Montoya*, 2013-NMSC-020, ¶ 22, 306 P.3d 426 (internal quotation marks and citation omitted). "Double jeopardy protects against multiple punishments for the same offense." *State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d 616. Cases involving multiple punishments are classified as either double-description cases, "where the same conduct results in multiple convictions under different statutes" or unit-of-prosecution cases, "where a defendant challenges multiple convictions under the same statute." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. Here, Defendants are challenging multiple convictions under both Sections 58-13B-3 and -30.

{58}    The relevant inquiry in a unit of prosecution case "is whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *Swafford v. State*, 1991-NMSC-043, ¶ 8, 112 N.M. 3, 810 P.2d 1223. To determine the unit of prosecution intended by the Legislature, we employ a two-part test. *See*

32

*State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230. "First, courts must analyze the statute to determine whether the Legislature has defined the unit of prosecution and, if the statute spells out the unit of prosecution, then the court follows that language and the inquiry is complete." *Id.* If the unit of prosecution is not clear from the statute, courts must "determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments." *State v. Gallegos*, 2011-NMSC-027, ¶ 31, 149 N.M. 704, 254 P.3d 655 (internal quotation marks and citation omitted).

**1.      Section 58-13B-30—Securities Fraud**

{59}      Defendants argue that the crime of securities fraud involves ongoing conduct for which a unit of prosecution is not strictly defined. We disagree. Section 58-13B-30 prohibits directly or indirectly "employ[ing] any device, scheme or artifice to defraud; . . . mak[ing] an untrue statement of a material fact or fail[ing] to state a necessary material fact where such an omission would be misleading; [and] . . . engag[ing] in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person[, i]n connection with the offer to sell, sale, offer to purchase or purchase of *a security*[.]" (Emphasis added.) This Court has held that this "statutory language indicates a legislative intent that each offer to sell or sale of a

33

security constitutes a separate unit of prosecution." *State v. Collins*, 2007-NMCA-106, ¶ 20, 142 N.M. 419, 166 P.3d 480.

{60}     Here the securities fraud convictions stemmed from: (1) the second transaction, in which Defendants offered the Duncans an ownership interest in Ox Development in exchange for $270,000, and promised to invest their contribution in a real estate project in Santa Barbara, California; (2) the third transaction in which Michael Maxwell convinced Mr. Duncan to withdraw his entire savings in the amount of $50,257.81, to be invested in commodities; and (3) the fifth transaction in which Michael Maxwell promised to invest $19,351 from Mrs. Duncan's granddaughter's trust account so that it would yield a greater return. Each transaction constituted an offer to sell a different security. *See* § 58-13B-2(X) (defining "security" to include "a note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; any limited partnership interest; any interest in a limited liability company; [or] investment contract"). Thus, the three convictions which stemmed from the three distinct offers to sell securities can be punished separately under Section 58-13B-30 and do not violate double jeopardy. *See Collins*, 2007-NMCA-106, ¶¶ 20-21.

## 2. Section 58-13B-3—Transacting Business as a Broker-Dealer Without a License

{61} With regard to transacting business as a broker-dealer without a license, Defendants argue that the plain meaning of the statutory language indicates that the Legislature intended to punish a course of conduct. Defendants argue that the language of the statute implies that a broker-dealer will transact business more than once, indicating the Legislature's intent to punish a person who transacts business but not an intent to punish that person for each transaction in which he is involved. Defendants even point to the title of the section, "Broker-dealer . . . licensing[,]" as an indication that the statute was intended to punish the unlicensed person and not an intent to punish for each unlicensed transaction.

{62} However, this Court rejected that interpretation of Section 58-13B-3. *See State v. Rivera*, 2009-NMCA-132, ¶¶ 26-30, 147 N.M. 406, 223 P.3d 951 (applying the *Herron-Barr* factors to determine whether the defendant's several acts of securities fraud and transacting business as a broker-dealer without a license were sufficiently distinct as to justify multiple punishments). Section 58-13B-3 makes it unlawful for a person to offer to sell or to sell any security in New Mexico unless: (a) the security is registered under the New Mexico Securities Act of 1986; (b) the security or transaction is exempt under that Act; or (c) the security is a federal covered security. In *Rivera*, this Court determined that the statutory language was not helpful in

35

determining the unit of prosecution, and considered the indicia of distinctness of each transaction in order to determine whether multiple punishments were justified under the statute. 2009-NMCA-132, ¶¶ 30-33.

{63} In that case, we recognized that the purpose of the New Mexico securities laws is "to protect individuals from falling prey to unscrupulous, fraudulent securities-related practices." *Id.* ¶ 31; *see State v. Kirby*, 2003-NMCA-074, ¶¶ 23-24, 133 N.M. 782, 70 P.3d 772 (stating that the provisions of the Securities Act "are aimed at protecting investors against unfair, deceptive, and fraudulent practices in the sale of securities[,]" and that "[t]he Act was written with all encompassing strokes to protect the public, and to further the legitimate governmental purpose of protecting the public from the many means promoters may use to separate the unwary from their money" (internal quotation marks and citation omitted)). We also acknowledged that "persons who are unlicensed [may] often engage in more than one securities-related transaction, and whether they are licensed or not, such persons [may] often attempt to reach more than one investor-victim." *Rivera*, 2009-NMCA-132, ¶ 31. We concluded that "[t]he securities laws anticipate that there can be several transactions and victims." *Id.* "We see the purpose of the securities laws generally, and the purpose of the licensing of broker-dealers and the securities registration laws specifically, to protect all potential investors." *Id.*

36

{64} In *Rivera*, we considered the following factors in determining whether the six transactions bore sufficient indicia of distinctness to justify multiple punishments: "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) [the] defendant's intent as evidenced by his conduct and utterances; and (6) number of victims." *Id.* ¶ 30 (internal quotation marks and citation omitted); *State v. Morro*, 1999-NMCA-118, ¶ 19, 127 N.M. 763, 987 P.2d 420 (same) (internal quotation marks and citation omitted); *see Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624; *State v. Barr*, 1999-NMCA-081, ¶ 16, 127 N.M. 504, 984 P.2d 185. In *Rivera*, we determined that, "each unlicensed transaction [was] distinct and separate in time, resulting in distinct and separate harm to different victims." 2009-NMCA-132, ¶ 32 (citing *State v. DeGraff*, 2006-NMSC-011, ¶ 33, 139 N.M. 211, 131 P.3d 61 and *Morro*, 1999-NMCA-118, ¶ 1). As a result, we concluded that the defendant's six convictions for transacting business as a broker-dealer without a license were sufficiently distinct to justify multiple punishments under Section 58-13B-3, and did not violate double jeopardy. *Rivera*, 2009-NMCA-132, ¶¶ 30-34.

{65} In the present case, the convictions under Section 58-13B-3 arose out of the same three transactions as the securities fraud convictions. In the second transaction, Defendants offered the Duncans an ownership interest in Ox Development in

37

exchange for $270,000, and promised to invest the funds into the Santa Barbara real estate contract. In the third transaction, Michael convinced Mr. Duncan to transfer all $50,257.81 of his savings to Defendants, who would invest it in commodities. In the fifth transaction, Michael promised Mrs. Duncan that he would invest $19,351 from her granddaughter's trust account to yield a greater return. Each transaction took place on a different date. According to the Duncans, each transfer was to be used for a different investment or business opportunity. Additionally we note the distinct approach to the Duncans in each of the three transactions. For the second transaction, the Duncans were involved in planning and financing the Santa Barbara contract. Whereas the third transaction involved only Mr. Duncan and the fifth transaction involved only Mrs. Duncan.

{66} To the extent Defendants argue that their conduct is unitary because it involved a course of conduct with one set of victims, we disagree. Defendants may have fulfilled some sort of overall plan or scheme to obtain funds from the Duncans by deceiving them at different times concerning different schemes. However, this "does not somehow mesh or coagulate [their] actions into but [three] offenses by labeling an activity to carry out the scheme a course of conduct." *Rivera*, 2009-NMCA-132, ¶ 33 (internal quotation marks omitted). Thus, the double jeopardy proscription does not require the separate convictions to be merged into one for punishment purposes

with respect to either Defendant's unlicensed status or the unregistered security status relating to each transaction. *See Collins*, 2007-NMCA-106, ¶¶ 21-22 (holding that the evidence supported separate convictions and punishments for sales of securities, namely, renewal notes to different victim-investors). We conclude that in this case, there are sufficient indicia of distinctness to justify punishments for each transaction under the New Mexico Securities Act. *See Rivera*, 2009-NMCA-132, ¶ 33.

## III.   CONCLUSION

{67}   For the foregoing reasons we affirm all of Michael's convictions as well as Steven's convictions on Counts 1, 3, 4, and 5. We reverse Steven's convictions on Counts 6, 7, 8, 9, 10, and 11 for insufficient evidence.

{68}   **IT IS SO ORDERED.**


_____

**M. MONICA ZAMORA, Judge**

**WE CONCUR:**


_____

**MICHAEL D. BUSTAMANTE, Judge**


_____

**TIMOTHY L. GARCIA, Judge**

39